SIXTH DIVISION

June 20, 2003

No. 1-01-1712

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court

Plaintiff-Appellee, ) Cook County.

)

) No. 98 CR 12477

)

LAVON BROWN, ) Honorable

) Stuart Palmer,

Defendant-Appellant. ) Judge Presiding.

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

A jury convicted defendant, Lavon Brown, of attempted armed robbery and two counts of attempted first-degree murder.  The trial court sentenced defendant to 15 years' imprisonment for the attempted armed robbery and two terms of 60 years' imprisonment for the attempted murders, all sentences to run concurrently.  Upon appeal, defendant argues: (1) the State failed to prove him guilty of attempted murder beyond a reasonable doubt; (2) the trial court improperly entered multiple convictions for the same act; (3) the trial court erred by refusing to instruct the jury on the defense of necessity and compulsion; and (4) the trial court erred by admitting hearsay evidence.  We affirm.

Patricia Gibbons worked as a special agent for the Bureau of Alcohol, Tobacco and Firearms (ATF), a federal agency, for 13 years.  In 1998, she also belonged to the Chicago Anti-Gun Enforcement (CAGE) task force, a joint cooperative between ATF agents and Chicago police officers which investigates the purchase and sale of illegal firearms in Chicago.  During her CAGE investigations, Special Agent Gibbons discovered that Joseph Vicario had illegally purchased 21 firearms in a three-year period.  In February 1998, Vicario was indicted on federal charges for falsifying the federal application form in connection with the purchase of five firearms.

After appearing in federal court on these charges, Vicario met with Special Agent Gibbons and two assistant United States Attorneys on March 19, 1998, and offered his cooperation in their investigation of codefendant John Burnom in exchange for consideration on his case.  Specifically, Vicario informed Special Agent Gibbons and the two United States Attorneys that he knew Burnom, a high ranking gang member who ran an area of Chicago called "Motown," and that he had engaged in numerous conversations with Burnom regarding the purchase of firearms. 

Special Agent Gibbons and Vicario formulated a plan whereby Vicario, in an undercover capacity, would meet with Burnom on March 30, 1998, for the purpose of selling him firearms.  The transaction would be monitored by the CAGE task force, headed by Special Agent Gibbons.  Vicario would drive a Cadillac specially equipped with a fixed video camera and various microphones and recording equipment.

On March 30, 1998, pursuant to their plan, Vicario met with Special Agent Gibbons in a parking lot at 87th Street and Kedzie Avenue.  Vicario was given the Cadillac with the audio and video surveillance equipment.

Later that day, Burnom drove up, exited his vehicle, and entered Vicario's Cadillac.  During their 10-minute conversation, the two men agreed that in exchange for various weaponry, defendant would pay Vicario a total of $2,800, in the form of $1,100 in cash and one-half ounce of pure heroin with a street value of $1,700.  They agreed to meet again in two days, on April 2, 1998, at a McDonald's parking lot on 79th Street and Western Avenue to conclude the transaction.

On April 2, 1998, CAGE team members Sergeant Eldon Urbikas, Officer Coles, and Officer David Harris (of the Chicago police department), and Special Agent Mike Casey (of the ATF) were dispatched to the McDonald's parking lot at approximately 11 a.m.  They were assigned to conduct surveillance from a Chicago police department undercover conversion van and to be the immediate arrest team.  The van took up a position in the north end of the McDonald's parking lot.

Meanwhile, Vicario arrived at 87th Street and Kedzie Avenue  and was given the specially equipped Cadillac.  Vicario then went to Burnom's "Motown" neighborhood, in the area of 51st Street and Racine Avenue, and began asking around if anyone had seen Burnom.  Special Agent Gibbons and two other ATF agents followed Vicario in a separate vehicle.

Vicario eventually spoke with a man named "Ernest,"later identified as the victim, Ernest Hopkins.  Vicario explained to Ernest that he was trying to locate Burnom.  Ernest told Vicario how to page Burnom.

Burnom returned Vicario's page and the two men reached an agreement to meet at approximately 3 p.m. at the McDonald's parking lot.  Special Agent Gibbons, the two ATF agents, and Vicario then drove to a forest preserve on 87th Street, where Special Agent Gibbons put a suitcase full of weapons in the trunk of the Cadillac.  Special Agent Gibbons told Vicario that the guns were not to leave the trunk of the car, and she also told him to park as close as possible to the covert van in the McDonald's parking lot.

At approximately 3 p.m., Vicario arrived at the McDonald's parking lot and pulled into a spot at the north end of the lot, in close proximity to the covert van containing Sergeant Urbikas, Officer Coles, Officer Harris, and Special Agent Casey.  Meanwhile, Special Agent Gibbons took up surveillance from a Shell gas station located on the northwest corner of 79th Street and Western Avenue, adjacent to and south of the McDonald's parking lot.

Later, a small green car pulled up next to Vicario's Cadillac.  There were two men in the car, including the victim Ernest Hopkins, who had earlier told Vicario how to page Burnom.  Vicario told them that he was looking for Burnom, and they replied that he was on the way.  Vicario then stated that he would only deal with Burnom.

The green car backed away and parked for a few moments alongside the covert van.  The driver of the car, later identified as the defendant, reached under the seat, retrieved a handgun, and handed it to Ernest Hopkins.  Hopkins put the gun in his waistband.

Defendant drove the green car into the Shell station.  At approximately this time, Special Agent Gibbons observed Burnom parked in the Shell station.  Special Agent Gibbons saw Burnom walk over to the green car and converse with the two occupants for approximately  two minutes.  Burnom then walked back to and reentered his car.

Meanwhile, defendant drove the green car into the McDonald's parking lot and backed alongside the covert van.  From inside the van, Sergeant Urbikas observed the defendant and his passenger, Ernest Hopkins, switch positions.  Defendant had a handgun in his waistband.

Hopkins pulled up next to the Cadillac.  Defendant exited the green car with a gun in his hands and told Vicario to exit the Cadillac.  As Vicario was exiting his vehicle, defendant placed the gun to Vicario's forehead.

Special Agent Gibbons immediately told her surveillance team to go in.  Sergeant Urbikas was the first to exit the van, followed by Officer Harris and the other two officers.  Both Sergeant Urbikas and Office Harris testified that they ran around the van toward Vicario and defendant and screamed "police, police" and ordered defendant to drop his gun.

Officer Harris testified that defendant moved the gun from Vicario's head, pointed the gun in the direction of Sergeant Urbikas and Officer Harris, and fired one shot.  The shot missed the officers and went through the roof of the Cadillac.

Officer Harris and Sergeant Urbikas returned fire toward defendant, who began running away.  As he was running, defendant turned and pointed his gun in Sergeant Urbikas's direction.  Sergeant Urbikas fired two shots at defendant.  Defendant then threw himself onto the ground.

Sergeant Urbikas saw Special Agent Casey coming along the fence to cover defendant.  At approximately the same time, Hopkins, who was still in the driver's seat of the green car, revved the engine and sped backwards, with the tires squealing.  Sergeant Urbikas had to jump out of the way of the car to avoid being hit.

Sergeant Urbikas saw that Hopkins was turned around and that his arm was behind the passenger seat headrest.  He heard Officer Coles screaming "stop him, stop him."  Sergeant Urbikas also heard gunfire and the sound of glass breaking and he saw that the rear passenger window of the green car had been broken out.  Thinking that Hopkins was shooting at the officers, Sergeant Urbikas fired into the driver's side of the car. 

Meanwhile, Officer Harris had observed Sergeant Urbikas jump out of the way of the green car and he thought that Urbikas had been hit.  He, too, heard Officer Coles scream "stop him, stop him" and saw Officer Coles fire one shot into the car.  Around the same time, Officer Harris saw that Hopkins was making a motion with his extended right hand in Officer Harris's direction and Officer Harris believed that Hopkins was armed.  Officer Harris therefore fired twice into the car.

The green car continued backward at a high rate of speed.  It hit a concrete divider, bounced forward, and came to rest.  Hopkins, who had been shot in the back and in the face, died as a result of his wounds.

Officer Harris ran over to defendant, handcuffed him, and took him into custody.  The officers called for medical attention for defendant, who sustained six bullet holes to the outer forearm of his left arm and four bullet holes to the inner forearm of his left arm.

Detective Szudarski testified that he interviewed defendant at the hospital later that same evening and that defendant told him the following:

"I was sitting in the car with my friend, and I was showing my gun to the people out in the car, and people started the –I saw police, they were jumping out of vans with tinted windows.  I went for my gun, but I didn't up it."

Defendant was subsequently brought to the police station, where he gave a statement to Assistant State's Attorney McCarthy. Defendant stated that he was a member of the Blackstone street gang and that Hopkins and codefendant Burnom were generals in the gang.  Burnom was the highest ranking general.

On April 2, 1998, Burnom asked defendant if he "wanted to make some money" on gang-related business.  Specifically, Burnom told defendant that he wanted help in stealing guns and money from Vicario.  Burnom told defendant and Hopkins to follow him to the scheduled meeting place with Vicario at 79th Street and Western Avenue.

Defendant stated that he drove Hopkins to the Shell station at 79th Street and Western Avenue where Burnom pointed out Vicario and told them to take the guns out of Vicario's trunk and bring them back to Burnom.

Defendant stated that he and Hopkins drove to the McDonald's and spoke with Vicario, who told them that he would only deal with Burnom.  Defendant became concerned that there might be some police in the area, so he drove back to the Shell station and expressed his concerns to Burnom.  Burnom became angry and told them to go back and steal the guns and money from Vicario.  Burnom threatened to kill Vicario unless they completed the robbery.

Defendant stated that he drove back to the McDonald's parking lot and switched seats with Hopkins.  Hopkins handed a gun to defendant, who exited the car and pointed the gun at Vicario.  Defendant then saw "guys" coming out of the nearby van. One of the guys had a gun and yelled at him to freeze and drop his weapon. 

Defendant stated that he pointed his gun at the men coming toward him and fired.  After he fired, defendant tried to get away and was shot in his left arm.  Defendant threw away his gun and fell to the ground.  He was later taken to the hospital to have his arm treated.  

The jury convicted defendant of attempted armed robbery and two counts of attempted first-degree murder.  The trial court sentenced defendant to 15 years in prison for the attempted armed robbery conviction and two terms of 60 years in prison for the attempted murder convictions, all sentences to run concurrently.  Defendant filed this timely appeal.

First, defendant argues that the State failed to prove him guilty of attempted murder beyond a reasonable doubt.  When presented with a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Smith
, 321 Ill. App. 3d 669, 673 (2001).

To prove defendant guilty of attempted first degree murder, the State must prove: (1) that defendant performed an act constituting a substantial step toward the commission of the murder; and (2) that defendant possessed the specific intent to kill.  
People v. Childress
, 321 Ill. App. 3d 13, 26 (2001).  Specific intent to kill may be shown by the surrounding circumstances, including the character of the assault and the use of a deadly weapon.  
People v. Stokes
, 293 Ill. App. 3d 643, 650 (1997).  Firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill.  
Stokes
, 293 Ill. App. 3d at 650.

Here, Officer Harris testified that defendant pointed his gun at Sergeant Urbikas and Officer Harris and fired one shot.  Mr. Vicario testified that defendant was "turning the gun toward" the approaching police officers (
i.e.
, Sergeant Urbikas and Officer Harris) when he fired.  Defendant admitted in his statement that he pointed his gun at the "guys" coming toward him (Sergeant Urbikas and Officer Harris) and fired a single shot. 

A rational trier of fact could find from all this evidence that defendant purposely fired his weapon at both Sergeant Urbikas and Officer Harris, that he had the specific intent to kill both men, and that by firing the weapon he took a substantial step toward committing two murders.  Accordingly, the State proved defendant guilty of the attempted first degree murder of Sergeant Urbikas and Officer Harris.  As there were two victims here, two convictions and sentences were proper.

Defendant next contends that he was improperly convicted of two attempted murders arising out of the same act.  Defendant's argument is not well taken.  As discussed above, there were two intended victims here, two attempted murders, and thus two convictions and sentences were proper.  See 
People v. Shum
, 117 Ill. 2d 317, 363 (1987)("separate victims require separate convictions and sentences.")

Next, defendant argues that the trial court erred by failing to instruct on the affirmative defense of necessity.  The trial court's determination as to the instructions to be given to the jury will not be disturbed absent an abuse of discretion.  
Dabros v. Wang
, 243 Ill. App. 3d 259, 267 (1993).  The test for determining whether the court abused its discretion in instructing the jury is whether, considered as a whole, the instructions are sufficiently clear and fairly and accurately state the applicable law.  
Dabros
, 243 Ill. App. 3d at 267.

Defendant argues that Burnom threatened to kill Vicario unless defendant went through with the armed robbery and, thus, that defendant attempted the armed robbery out of necessity to protect Vicario's life.  Defendant therefore contends that he was entitled to an instruction on the affirmative defense of necessity.

The Criminal Code of 1961 (Code) defines necessity as follows:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."  720 ILCS 5/7-13 (West 2000).

In the present case, the record shows that 
prior
 to any threats against Vicario's life, defendant voluntarily agreed to Burnom's plan to rob Vicario.  Pursuant to that plan, defendant willingly drove to the Shell station parking lot, conversed with Burnom about the details of the robbery, then drove Hopkins (who was armed) to the assigned meeting place where they spoke with Vicario.  Accordingly, defendant was not "without blame in occasioning or developing the situation" (720 ILCS 5/7-13 (West 2000)) and therefore the trial court did not abuse its discretion by denying the necessity instruction. 

Next, defendant argues that the trial court erred by failing to instruct on the affirmative defense of compulsion.  Section 7-11(a) of the Code defines compulsion as follows:

"A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."  720 ILCS 5/7-11(a) (West 2000).

Defendant contends that he followed through with the planned armed robbery out of compulsion that Burnom would otherwise severely beat or kill him.  In support, defendant points to testimony that Burnom was a violent person capable of killing gang members who disobeyed his orders.  However, defendant points to no evidence in the record that Burnom threatened him with any immediate harm for failing to follow through with the robbery.  Accordingly, the trial court did not abuse its discretion by denying the compulsion instruction. See 
People v. Scherzer
, 179 Ill. App. 3d 624, 644 (1989)("A threat of future injury is not enough to raise the defense of compulsion. [Citations.]  The threat must be of 
imminent
 death or great bodily harm." (Emphasis in original.))

Next, defendant argues that the trial court erred by admitting evidence of the March 30, 1998, conversation between Burnom and Vicario in which they arranged the weapons for cash/heroin transaction.   The trial court admitted the March 30, 1998, conversation pursuant to the coconspirator exception to the hearsay rule.  Under this exception, any declaration by one coconspirator is admissible against all conspirators where the declaration was made during the pendency of and in furtherance of the conspiracy.  
People v. Smith
, 318 Ill. App. 3d 64, 71 (2000).  To establish a 
prima
 
facie
 showing of conspiracy, the State must independently prove that: (1) two or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) an act or acts were done by one or more of them in furtherance of the conspiracy.  
People v. Batrez
, 334 Ill. App. 3d 772, 783 (2002).

The State argues that the March 30, 1998, conversation between Burnom and Vicario was admissible as it was made during the pendency of and in furtherance of the conspiracy between Burnom and defendant to rob Vicario.  We disagree.  As of March 30, 1998, Burnom had not told defendant about his plan to rob Vicario and there is no evidence anywhere in the record that the defendant had by that date engaged in a common plan with Burnom to accomplish his criminal goal.  Rather, the record indicates that the conspiracy between Burnom and defendant did not come into existence until April 2, 1998, the date Burnom and defendant first discussed and agreed to the common plan to rob Vicario.  Accordingly, the trial court erred in admitting the March 30, 1998, conversation as that conversation was made prior to (and 
not
 during the pendency of) the conspiracy between Burnom and defendant.

The error was harmless, though, given the testimony of Special Agent Gibbons, Sergeant Urbikas, Officer Harris, and defendant's own statement detailing defendant's participation in the attempted armed robbery and attempted murders.  Thus, defendant would have been convicted even if the March 30, 1998, conversation had not been admitted. Accordingly, we find no prejudicial error or cause for reversal.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER,  and O'MARA FROSSARD, JJ.'s, concur.