THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RORY COOK, Defendant-Appellant.

First District (6th Division)   No. 1—01—1688

Opinion filed August 27, 2004.

Edwin A. Burnette, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon Malavia, and Samuel P. Cervera, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant Rory Cook was convicted of the first degree murder of Brian Keith Bell. The trial court sentenced defendant to 30 years in prison. On appeal, defendant contends that: (1) police obtained his inculpatory statements in violation of his *Miranda* rights; (2) the introduction of statements by codefendant Darryl Bunch was improper because the remarks did not fall under the coconspirator exception to the hearsay rule; (3) because the jury was instructed on self-defense, the trial court erred in suppressing evidence of Bell's prior violent behavior; (4) the trial court erred in failing to instruct the jury on the "serious provocation" theory of second degree murder; and (5) the evidence supported a conviction for involuntary manslaughter, as opposed to first degree murder. Because we reject all of these arguments, we affirm defendant's conviction and sentence.

Defendant's Motion to Suppress Statements

Defendant was charged with first degree murder under alternative theories: shooting Bell intentionally or acting with the knowledge that he created a strong probability of death or great bodily harm.[1] Before trial, the court heard testimony pertaining to defendant's motion to suppress his statements. In the motion, defendant asserted that he was not adequately informed of his *Miranda* rights and also alleged that police told him he would be charged with aggravated battery. At the motion hearing, Chicago police officer Robert Hodges testified that he was called to 11259 King Drive in Chicago at about 10:30 p.m. on April 3, 1999, in response to a report of gunfire. Upon arriving, he observed defendant on top of Bell, strangling him. While Officer Hodges and his partner transported defendant to Area 2 headquarters, his partner informed defendant of his *Miranda* rights. According to Officer Hodges, after the reading of his *Miranda* rights, defendant did

---

[1]Defendant's jury trial and Bunch's bench trial were held simultaneously. The trial court convicted Bunch of the first degree murder of Bell on an accountability theory and sentenced him to 20 years in prison, and this court affirmed Bunch's conviction and sentence in a separate appeal. *People v. Bunch*, No. 1—01—2517 (2003) (unpublished order under Supreme Court Rule 23).

not directly respond but instead was "combative and irate about the whole situation." On cross-examination, the officer stated that defendant's clothing was bloody and his eye was injured.

Chicago police officer David Zacek testified that he was called to the scene and helped pull defendant off Bell. The officer interviewed defendant at the police station at about 11:30 p.m. Officer Zacek advised defendant of his *Miranda* rights, and defendant did not respond. Instead, defendant continued to deny involvement in the shooting. On cross-examination, Officer Zacek stated that in addition to his reading of the *Miranda* warnings, his partner also advised defendant of his *Miranda* rights at the scene of the shooting. Defendant did not respond to the *Miranda* warnings but was "obnoxious, yelling and being combative." The parties stipulated that Officers Hodges and Zacek both would testify that defendant did not invoke his *Miranda* rights in their presence.

Chicago police detective Sylvia Van Witzenburg testified that she and her partner, Detective Robert Arteaga, were at the crime scene and that they interviewed Bell's girlfriend and also spoke with Dana Hunt, defendant's girlfriend. At about 5 a.m. on April 4, Detective Van Witzenburg and another detective interviewed defendant after advising him of his *Miranda* rights. Defendant indicated that he understood his rights. After defendant made a statement, Detective Van Witzenburg confronted defendant with inconsistencies in that account and left to speak with additional witnesses. When Detective Van Witzenburg returned at about 6:40 a.m., she spoke to defendant again and then left to locate Bunch.

Chicago police officer Robert Bartik testified that at about 10:45 a.m. on April 4, he informed defendant of his *Miranda* rights in preparation for administering a polygraph examination. Before the polygraph test began, defendant made incriminating statements to Officer Bartik and to a police detective; therefore, the polygraph test was not given. Officer Bartik denied telling defendant that he only would be charged with aggravated battery.

Detective Van Witzenburg testified that she and her partner interviewed Bunch and Hunt on April 4 and spoke with defendant again at about 9 p.m. Defendant and Hunt, with whom he lived, consented to a search of their apartment, where a weapon was recovered. Detectives Van Witzenburg and Arteaga interviewed defendant at about 11:30 p.m. and again at about 2 a.m. on April 5 in the presence of Assistant Cook County State's Attorney Tom Key.

Key testified that he asked defendant if he had been read his *Miranda* rights, and defendant responded that he had. Key readvised defendant of those rights before he and Detective Van Witzenburg

interviewed defendant. At about 5:30 a.m., defendant indicated that he wished to make a statement to be handwritten by Key. Key presented defendant with a preprinted form listing the *Miranda* warnings, and defendant signed his name below those warnings. Key wrote down defendant's statement. Key testified that defendant did not ask for an attorney or invoke any of his other rights under *Miranda*.

Defendant testified that on the day of the shooting, he began drinking beer and liquor at about 5 p.m. At about 10:30 p.m., he and Bell fought in front of defendant's apartment. Defendant said Bell struck him in the head with a hammer and that his eye was injured when he hit the pavement. Defendant testified that his head was bleeding badly and he was dazed and seeing double. Defendant stated that after he was transported to the police station and placed in an interrogation room, he spoke to a female detective. When the detective asked him if he wanted to tell her what happened, defendant told her he would like to see a lawyer. Defendant said the female detective left the room without responding. Defendant said a white male detective came into the room and told him to tell them the truth. A black male detective also entered and told defendant he had been charged with aggravated battery; that detective then left the room. Defendant said neither male detective informed him of his rights. Defendant said he told them he wanted to see the female detective, who took a statement from defendant and wrote it down. Defendant did not recall if he signed the statement, but stated that he passed out in the interview room after the detective left.

Defendant testified that when he was taken to another building for a polygraph test the next day, he was "badly beaten and hurting" and could not read a form he was given. Defendant said a detective read the form to him, and he told the detective he did not want to take the test without an attorney present. Defendant said he signed the form after he was told that the document memorialized his refusal to undergo the test in the absence of counsel.

Defendant was returned to police headquarters, where he met with Key, who took down his statement. Defendant said Key did not identify himself as an assistant State's Attorney. Defendant admitted signing the statement and initialing each page but said he signed the statement only because he thought he would not have a fair trial otherwise. Defendant said Key did not read him his *Miranda* rights and that the only time he was reminded of those warnings was by the man who was going to administer the polygraph exam.

On cross-examination, defendant acknowledged that between March 1986 and March 1998, he had 105 contacts with Chicago police and had stayed overnight in a police station about 65 times. When

asked how many times he had been informed of his *Miranda* rights on those prior occasions, defendant responded about "45 percent" of the time. Defendant admitted signing the waiver of his rights but said he was in pain at the time and did not read the document because his eyes were badly damaged. Defendant said that at Cook County jail, he received Motrin and a bandage for his injuries. He also stated he did not understand his rights as Key read them to him. At the close of evidence, the trial court denied defendant's motion to suppress his inculpatory statements.

### The State's Evidentiary Motions

Prior to trial, defendant's counsel indicated that self-defense might be raised as an affirmative defense. In that situation, a defendant is permitted to present evidence of the victim's aggressive and violent character, if such evidence exists, to demonstrate which party was the aggressor, pursuant to *People v. Lynch*, 104 Ill. 2d 194, 200-01, 470 N.E.2d 1018, 1020 (1984). The State filed a motion *in limine* seeking to bar the testimony of five police officers who would testify that Bell was charged with misdemeanor battery and three instances of domestic battery between 1991 and 1998 and provide an account of the events leading to those charges. The State argued that although evidence of the victim's character can be introduced per *Lynch*, those particular accounts of Bell's arrests would constitute hearsay. After an offer of proof, the trial court held that the testimony would be hearsay and also noted that the complaining witnesses did not appear in court proceedings to pursue charges against Bell. For those reasons, the trial court granted the State's motion *in limine*. However, the court allowed Bell's sister, Chovan Bell, to testify that in 1994, she called the police and signed a complaint against Bell after she and her fiancé received facial injuries.

The State also requested that the court allow into evidence certain out-of-court statements by Bunch under the coconspirator exception to the hearsay rule, contending that those remarks were made in furtherance of the conspiracy to shoot Bell. Defense counsel objected to the admission of those statements, arguing that Bunch and defendant did not conspire to kill Bell but, rather, defendant killed Bell in self-defense while the two men argued and fought. Based upon the State's representation of what the evidence would show, the trial court ruled that the proffered remarks by Bunch qualified as coconspirator statements.

### The State's Evidence at Trial

At trial, Hunt testified on behalf of the prosecution. Hunt stated that she and defendant had been dating for four years and that in

April 1999, they lived at 11259 King Drive. Hunt stated that defendant had let Bell move into the apartment below theirs because the building's owner disappeared and no tenants were paying rent. Hunt said defendant charged Bell to live in the unit, but she did not know how much defendant received from Bell.

On the day of the shooting, Hunt returned to the apartment between 3:30 and 4 p.m. and found that defendant and a friend, Garrett Scruthens, were drinking, and she joined them. At about 6 p.m., defendant left to buy alcohol. Hunt stated that defendant had to pass Bell's apartment to leave the building. By the time defendant returned, Bunch had arrived. After Bunch gave defendant $20, defendant left the apartment at about 7 p.m. to buy crack cocaine at an apartment in their building. Hunt said that for defendant to reach that apartment, he had to pass Bell's unit. About 10 minutes later, Hunt heard defendant arguing and fighting with Bell across the street. (Hunt would later testify that Bell had a hammer in his hand during this altercation.) Defendant returned to the apartment bleeding from a scrape on the right side of his forehead. Hunt, defendant, Bunch and Scruthens drank and smoked crack for one or two hours, and Bunch told defendant that defendant "should have stomped him." When defendant and Bunch left to buy more alcohol, Hunt went to Bell's apartment and gave him $10 that Bell had previously claimed defendant owed him.

Defendant and Bunch returned and they all began drinking again at 8:30 or 9 p.m. Hunt testified that Bunch told defendant, referring to Bell, that defendant "should have popped him—he should pop him." Bunch pulled a gun out, removed the bullets and reloaded them, and placed the gun on the table. Defendant replied that "he would if [Bell] kept f------ with him." Defendant also said that if Bell started any trouble, he would put Bell "to sleep." Defendant took the gun and put it in his back pocket. Hunt testified that defendant "went to lock the door" and she heard defendant and Bell arguing again. Defendant pulled the weapon from his pocket and the men fought over it. Hunt turned to go up the stairs and heard shots fired. Hunt acknowledged her grand jury testimony that when defendant left the apartment, she thought he was going to confront Bell.

On cross-examination, Hunt said that the weekend before the shooting, Bell came to defendant and Hunt's apartment several times looking for defendant and threatening to "kick [defendant's] a--" if defendant did not repay Bell. Hunt stated that immediately before the shooting, Bell came to the door and defendant went into the hall and followed Bell downstairs. Hunt stated that the two men were pushing each other, and Bell dragged defendant into the hallway by his collar and defendant pulled the gun out.

Chicago police officer David Showers testified that when he arrived at the scene, Bell was lying on his back on the ground and defendant was on top of Bell choking him. Officer Showers pulled defendant off Bell. Defendant had blood on his hands and on the thigh portion of his pants. Bell told the officer several times that defendant had shot him.

Chicago police officer Cordy Fouch offered testimony similar to that of his partner, Officer Showers. Officer Fouch testified that after Bell said he had been shot, he asked Bell where the gun was. According to the officer, Bell replied that defendant "gave it to his boy who ran into the building." Officer Fouch stated that Bell had a gunshot wound to the abdomen.

Chicago police detective Paul Bernatek testified that he and Detective Van Witzenburg interrogated defendant at about 5 a.m. on April 4 after Detective Van Witzenburg advised defendant of his *Miranda* rights. Defendant told the detectives that on April 2, Bell had approached him and said defendant owed him $10 because Bell overpaid defendant for his rent. Defendant said Bell took the gun from him and shot himself five times. At about 6:40 a.m., defendant offered a different account, admitting that he shot Bell and that Bell did not have anything in his hands. Detective Bernatek stated that before defendant made that statement, he had been given the *Miranda* warnings and "acknowledged that he knew his rights."

Chicago police detective Robert McVicker testified that on April 4, after defendant was transported to undergo a polygraph test, defendant said he had lied and wanted to tell the truth. Defendant said Bunch was a security guard and they had gone to Bunch's apartment together to get Bunch's gun. After they returned to defendant's apartment, Bunch loaded the weapon and handed it to defendant, telling defendant to shoot Bell if they fought again. Defendant admitted firing the gun three times and shooting Bell.

Detective Van Witzenburg testified that she and Arteaga interviewed Bunch and Hunt on April 4, and a search of defendant and Hunt's apartment revealed a gun hidden in the couch. Detective Van Witzenburg spoke to defendant again at about 11:30 p.m. that night, and again at 2 a.m., 4 a.m. and 5:30 a.m. April 5. The latter three interviews also included Key, who took defendant's statement in the last interview. Defendant told them that he and Bell had argued and fought the previous night and he told Bunch and Hunt that he would hurt Bell if any more arguing took place. Defendant said he heard Bell downstairs and went down to confront him. Defendant admitted that he decided to shoot Bell if Bell touched him and that he shot Bell once as they fought. They exchanged words and defendant shot Bell two

more times. After Bell fell to the ground, defendant got on top of him, and Bunch came over to them and took the gun out of defendant's hand. Defendant said Bell was unarmed during the incident.

Key offered testimony consistent with his account given at the motion hearing, stating that he met with defendant at 2 a.m. on April 5 and advised defendant of his *Miranda* rights before writing down defendant's statement. In the statement, defendant admitted that after his first encounter with Bell that night, he and Bunch went to Bunch's house to get Bunch's gun, and that during the ride, Bunch said defendant should have "whooped [Bell's] a-- while he had him on the ground" and that defendant should shoot Bell "if he started any s--- again." When the men returned to defendant and Hunt's apartment, Bunch told defendant that he should "pop [Bell's] a--," meaning that he should shoot Bell. Defendant said he was going to ask Bell if "this s--- was over with" and if Bell said no, defendant would shoot him. Defendant said when they heard Bell's door open, Bunch handed him the gun and defendant went downstairs. The remainder of defendant's statement is consistent with the previous testimony regarding his confessions. Defendant told Key that Bell did not have a weapon.

Bell's autopsy indicated that he was shot in the abdomen and in the right hand. The parties stipulated that forensic testing indicated that gunshot residue was found on Bell's right palm and defendant's left palm and the back of defendant's left hand. It was also stipulated that the presence of such residue means a person discharged, handled or was in close proximity to a weapon but that the testing did not distinguish which of those forms of contact had occurred. The parties also stipulated that gunshot residue can travel up to six feet from the gun barrel and up to four feet to the sides of the barrel. The State rested.

Defendant's Testimony

Defendant testified that he and Scruthens started drinking and smoking five or six bags of crack cocaine at 3:30 or 4 p.m. Defendant said that smoking crack made him feel "paranoid, scared, weak." He also stated that he had been drinking for "about three days straight." Defendant said Scruthens told him that Bell had come to the apartment earlier looking for him. Defendant left at about 5 p.m. to buy liquor with $3 that Scruthens gave him. On his way out, defendant saw Bell, who asked him for $10. Defendant said he did not have the money, and Bell said OK and returned to his apartment. When defendant returned from the liquor store, Bell stopped him in the hallway and asked him for the money again, pointing out that

defendant had just purchased liquor. Defendant told him he bought the alcohol with money from Scruthens.

Defendant returned to his apartment, and Bunch arrived at about 6 p.m. Bunch gave defendant $20 and asked him to buy two more bags of cocaine. Defendant encountered Bell in the hallway, where Bell tried to take the money from him. Defendant said he tried to get out of the front door but Bell chased him across the street. Defendant said he was unarmed and that Bell carried a ring of five or six keys that he used to strike defendant in the back. The men wrestled, and Bell grabbed defendant's head and pushed it down on the concrete, scraping defendant's face. Defendant said Hunt came down and told them to stop fighting. Defendant went upstairs and washed his face and his bloody shirt.

At about 10 p.m., Bunch and defendant left again to buy alcohol, and they went to Bunch's house so Bunch could call his girlfriend. During their trip, Bunch told defendant he "should have whooped [Bell's] a--" while defendant had him on the ground. They returned to defendant's apartment and continued drinking. At one point, defendant left the room and when he returned, a gun was on the table. After hearing the first-floor entrance door to the building being kicked in, defendant took the gun and he, Bunch, Scruthens and Hunt started to leave the apartment. Defendant said he did not know if the gun was loaded, adding that he was "scared of guns."

Defendant said he went to the door of his apartment and tried to close the door but Bell was coming up the stairs. Defendant and Bell argued with Hunt standing between them. Defendant said he told Bell to "go on and cool out." Defendant said Bell responded, "F--- you, this is round two," and swung at defendant with a hammer, striking defendant in the head.

Defendant testified that although his apartment door was open, he ran downstairs to get away from Bell. As defendant tried to open the front door of the building, Bell grabbed the hood of defendant's sweatshirt and threw him back against the door. Defendant pulled the gun from his back pocket with his right hand and held it up to scare Bell. Defendant said Bell grabbed the weapon with both hands and they fell to the ground struggling over the gun when the gun fired. Defendant did not know if Bell had been shot. Bunch approached them and took the gun out of defendant's hand. However, defendant also stated that he continued to hold Bell down because he did not know who had the gun.

Defendant said that after his arrest, he told Key that he wanted to speak with a lawyer but was told no one was there. Defendant admitted signing the inculpatory statement after Key read the entire state-

ment to him but contended that Key and the police concocted the statement's content and he did not protest at the time because he was physically exhausted.

On cross-examination, defendant said he did not know that Bunch retrieved his gun when they went to Bunch's apartment. He stated that when he and Bell wrestled the first time and he was struck with the keys, he felt he was in a life-threatening situation; however, he later said he did not call police about the altercation because he "didn't feel it was a big deal." Defendant said that despite his fear of guns, he took the weapon so he would not get hurt. The defense rested.

The jury was instructed on the offenses of first degree murder, second degree murder and involuntary manslaughter. The second degree murder instruction was based on an unreasonable belief in the use of deadly force against the victim. The jury convicted defendant of first degree murder, and after a sentencing hearing, the court ordered defendant to serve 30 years in prison.

Defendant's Contentions on Appeal

We first address defendant's arguments that his admissions were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Defendant first contends that the trial court should have suppressed his inculpatory statements because of the duration of his questioning and because he was not adequately informed of his *Miranda* rights during the multiple interviews.

The prosecution may not use statements, either inculpatory or exculpatory, obtained during the custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards that protect the accused's fifth amendment right against self-incrimination. *Rhode Island v. Innis*, 446 U.S. 291, 297, 64 L. Ed. 2d 297, 305, 100 S. Ct. 1682, 1688, quoting *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. Those safeguards are the now-familiar *Miranda* warnings, which provide that an accused has a right to remain silent, that any statement made can be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612.

■ Generally, a motion to suppress evidence presents mixed questions of law and fact; the trial court weighs the evidence and determines the facts surrounding the incident in question, after which it determines whether the facts constitute a violation of the defendant's rights. *People v. Harris*, 207 Ill. 2d 515, 521, 802 N.E.2d 219, 224 (2003). While the reviewing court defers to the trial court's factual findings, the trial court's ultimate ruling on a defendant's motion to

suppress is reviewed *de novo*. *Harris*, 207 Ill. 2d at 521, 802 N.E.2d at 224. In considering a ruling on a motion to suppress, a reviewing court may consider evidence presented at trial as well as the evidence that was presented at the suppression hearing. *People v. Watson*, 315 Ill. App. 3d 866, 876, 735 N.E.2d 75, 83 (2000).

The State points out that defendant was read his *Miranda* rights six times: by Officer Hodges or Officer Showers in the police car immediately after the shooting; by Officer Zacek at the police station about an hour after the shooting; by Detective Van Witzenburg in an interview room at about 5 a.m. on April 4; by Officer Bartik in preparation for the polygraph examination at 10:45 a.m. that day; and twice by Key before taking defendant's statement, at about 2 a.m. and again at about 5:30 a.m. on April 5. The State also points out that defendant signed a written waiver of his *Miranda* rights without requesting an attorney.

Defendant contends that the only time that the *Miranda* warnings were "unequivocally given and waived" was at the 5 a.m. interview on April 4, where Detectives Van Witzenburg and Bernatek questioned him. Defendant asserts that no *Miranda* warnings were given prior to his most damaging admissions, namely, his statements to Officer McVicker immediately before he was to take the polygraph test, when defendant stated that he and Bunch had gone to Bunch's apartment to get the gun and that Bunch told him to shoot Bell. He argues that *Miranda* warnings are required before every custodial interrogation and that his silence on several occasions after being informed of his rights cannot be presumed as a waiver of those protections.

■ We disagree with defendant's assertions regarding the law on this point. A defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may support a conclusion that the defendant has waived his rights. *People v. Watson*, 315 Ill. App. 3d 866, 878, 735 N.E.2d 75, 84 (2000), citing *North Carolina v. Butler*, 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292, 99 S. Ct. 1755, 1757 (1979). Moreover, once an accused has been advised of his *Miranda* warnings and acknowledges his understanding of them, the voluntariness of a subsequent statement is not compromised by the police's failure to repeat the warnings at each successive interview. *Watson*, 315 Ill. App. 3d at 878, 735 N.E.2d at 84. The State needs to prove a waiver of *Miranda* rights by a preponderance of the evidence. *Watson*, 315 Ill. App. 3d at 878, 735 N.E.2d at 84.

■ The evidence presented at the motion hearing and at trial indicates that the first two times police recited the *Miranda* warnings to defendant, he did not directly respond but acted in a belligerent manner, denying involvement in the shooting. However, Detective Van

Witzenburg testified that at about 5 a.m. on April 4, she and a partner interviewed defendant and informed him of his *Miranda* rights, which defendant indicated he understood, and defendant then spoke to the detectives. While the voluntariness of defendant's statement would not have been threatened if police had not repeated the warnings during subsequent interviews (see *Watson*, 315 Ill. App. 3d at 878, 735 N.E.2d at 84), the record nevertheless reveals that the *Miranda* warnings were repeated on three future occasions, including twice in less than three hours before defendant made a statement recorded by Key. During the interview with Key, defendant signed a written waiver of his *Miranda* rights. Given that evidence, we find that defendant was fully informed of his *Miranda* rights and knowingly and intelligently waived those protections.

Defendant further asserts that his statements were involuntary because he required medical attention during his interrogation and did not receive such care. He contends that during questioning, his vision was blurred and he was dazed and exhausted, and that the officers, detectives and prosecutors "exploit[ed] his painful condition and need for medical treatment."

The general test of voluntariness is whether the defendant made a statement freely and without compulsion or inducement of any sort or whether his or her will was overcome at the time of the confession. *In re G.O.*, 191 Ill. 2d 37, 54, 727 N.E.2d 1003, 1012 (2000). In determining whether a confession is voluntary, this court examines the totality of the circumstances, including the defendant's age, intelligence, background, experience, mental capacity, education and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including threats or promises. *G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. No single factor is dispositive. *G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012.

Considering all of those factors, we reject defendant's claim that his statement was involuntary due to his physical condition during questioning. Although defendant asserts that he was bleeding from a head wound that impaired his vision and his mental capacity, the record indicates that defendant received pain reliever and a bandage for his cut, suggesting that defendant's wound was not of the severity that he now claims. At trial, defendant testified that although the jail intake officer told him he was "badly bleeding" and suggested that he be transported to the hospital, defendant "didn't want [to go] because the wound dried up and I figured I would get better treatment here than if I go to the hospital, and then they'll throw me back in the lockup." Defendant's nonchalant reaction after being offered profes-

sional medical care is compelling evidence that his physical injuries were not of a level that would render his inculpatory statements involuntary.

Defendant repeatedly cites *People v. Strickland*, 129 Ill. 2d 550, 544 N.E.2d 758 (1989), in support of his contention that physical pain and a lack of medical attention can render a suspect's statements involuntary. However, defendant stops short of likening his injuries to those of the accused in *Strickland*, and we agree that such a comparison is problematic. In *Strickland*, the supreme court held that police officers coerced a defendant's inculpatory statements because the defendant may have believed that the treatment of a gunshot wound to his finger was dependent on his confession. *Strickland*, 129 Ill. 2d at 558, 554 N.E.2d at 761. In the instant case, not only does the evidence suggest that defendant did not suffer an injury of such severity, defendant testified that he refused medical treatment when it was offered to him. Furthermore, unlike the accused in *Strickland*, defendant does not contend that officers told him he would not receive treatment unless he confessed.

We further note that a defendant's previous experience with the criminal justice system is relevant to a determination of whether a defendant is aware of his rights and whether a statement is given voluntarily. *People v. Johnson*, 208 Ill. 2d 53, 108, 803 N.E.2d 405, 437 (2003). Defendant testified at the motion hearing that police had held him overnight on 65 previous occasions. Although defendant innocuously labels his criminal record as "limited to theft and drug offenses" and asserts that he "had no criminal experience akin to this," defendant's previous encounters with law enforcement are relevant to a determination of whether his custodial statements were reliable and truthful. See *Johnson*, 208 Ill. 2d at 108, 803 N.E.2d at 437. Having considered the evidence presented, we conclude that defendant's inculpatory statements were voluntary and were not obtained in violation of *Miranda*.

Defendant next contends that the trial court committed reversible error in allowing the State to introduce the testimony of three witnesses that Bunch made statements encouraging defendant to shoot Bell. Defendant argues that Bunch's remarks did not qualify as coconspirator declarations under that exception to the hearsay rule because, aside from those statements, no evidence was presented that he and Bunch conspired to commit the offense. In his reply brief, defendant supplements that argument by referring to the recent United States Supreme Court decision in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which prohibits the introduction of out-of-court testimonial statements unless the declar-

ant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.

We address the latter argument first. The confrontation clause of the sixth amendment to the United States Constitution protects individuals from the use of *ex parte* statements as evidence against them in a criminal trial. *Crawford*, 541 U.S. at 50, 158 L. Ed. 2d at 192, 124 S. Ct. at 1363. In *Crawford*, the defendant was charged with assault and attempted murder after he stabbed a man who allegedly tried to rape the defendant's wife. *Crawford*, 541 U.S. at 38-39, 158 L. Ed. 2d at 184-85, 124 S. Ct. at 1356-57. The defendant's wife invoked Washington's marital privilege and did not testify against the defendant, and the State sought to use portions of the wife's statements to police to challenge the defendant's claim that the stabbing was in self-defense. *Crawford*, 541 U.S. at 39, 158 L. Ed. 2d at 185, 124 S. Ct. at 1357. The Supreme Court held that because the marital privilege denied the defendant the opportunity to cross-examine his wife, the admission of the wife's tape-recorded statement violated the confrontation clause, which provides the accused with the right "to be confronted with the witnesses against him." U.S. Const., amend. VI; *Crawford*, 541 U.S. at 42, 158 L. Ed. 2d at 187, 124 S. Ct. at 1359. In so holding, the Supreme Court nullified the previous framework for judging the reliability of the statements of unavailable witnesses that it established in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

As another division of this court has noted in examining *Crawford*, judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to all matters that are pending on direct review when the new rule is declared. *People v. Martinez*, 348 Ill. App. 3d 521, 558, 810 N.E.2d 199, 211 (2004), citing *People v. Ford*, 198 Ill. 2d 68, 761 N.E.2d 735 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987). *Crawford* was decided on March 8, 2004. Accordingly, we consider defendant's argument that *Crawford* bars the introduction of Bunch's statements, which were elicited via the testimony of Hunt, Detective McVicker and Key, that, *inter alia*, defendant should "pop [Bell's] a--," defendant "should have stomped him," and defendant should shoot Bell if Bell continued to argue with him.

Defendant's assertion is expressly contradicted by *Crawford* and subsequent cases that have interpreted its holding. Although the Supreme Court did not offer a comprehensive list of what would qualify as testimonial evidence, the court specified that plea allocutions, police interrogations and testimony from appearances before a grand jury, at trial or at a preliminary hearing constituted testimonial

statements. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The Supreme Court furthermore observed the existence of several historical exceptions to the exclusion of hearsay evidence, including statements made in furtherance of a conspiracy, which the court noted are not testimonial and therefore not protected by the confrontation clause. *Crawford*, 541 U.S. at 55-56, 158 L. Ed. 2d at 195-96, 124 S. Ct. at 1367.

In a concurring opinion, Chief Justice Rehnquist discussed the rationale supporting the admission of coconspirator statements into evidence regardless of their hearsay nature. "Because the statements are made while the declarant and the accused are partners in an illegal enterprise, the statements are unlikely to be false and their admission 'actually furthers the "Confrontation Clause's very mission" which is to "advance the accuracy of the truth-determining process in criminal trials." ' " *Crawford*, 541 U.S. at 74, 158 L. Ed. 2d at 206-07, 124 S. Ct. at 1377 (Rehnquist, C.J., concurring, joined by O'Connor, J.), quoting *United States v. Inadi*, 475 U.S. 387, 396, 89 L. Ed. 2d 390, 399, 106 S. Ct. 1121, 1126 (1986), quoting *Tennessee v. Street*, 471 U.S. 409, 415, 85 L. Ed. 2d 425, 431-32, 105 S. Ct. 2078, 2082 (1985).[2] See also *United States v. Lee*, 374 F.3d 637, 643 (8th Cir. 2004); *United States v. Reyes*, 362 F.3d 536, 540-41 (8th Cir. 2004) (both noting *Crawford*'s classification of coconspirator statements as nontestimonial). Therefore, if the statements in question qualify as coconspirator statements, the rule announced in *Crawford* does not apply to bar their admission.

Defendant argues that Bunch's remarks were not admissible as coconspirator statements because the prosecution failed to offer sufficient evidence of a criminal agreement between the two men, apart from the statements at issue, and although defendant had an ongoing disagreement with Bell regarding money, Bunch had no joint interest in that dispute. Defendant points out that he testified at trial that the only statement Bunch made to him regarding Bell was that defendant "should have whooped [Bell's] a--" when defendant had him on the ground. He claims that the altercation with Bell occurred spontaneously and that no "future plan" to harm Bell existed.

■ The State correctly responds that defendant waived any objection to the statements by failing to include his arguments in his post-

---

[2]The Supreme Court in *Inadi* contrasted coconspirator statements to live trial testimony, stating that "co-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence." *Inadi*, 475 U.S. at 395-96, 89 L. Ed. 2d at 399, 106 S. Ct. at 1126.

trial motion, and, furthermore, defendant has not shown the statements' admission was plain error. Issues raised on appeal are preserved for review by objecting during trial and filing a written posttrial motion raising the alleged error. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). Failure to preserve an alleged error constitutes a procedural default of that error on appeal, and while this court can review an unpreserved error if we determine it has affected a substantial right, we must determine whether any error occurred before the plain error exception can be invoked. See *People v. Chapman*, 194 Ill. 2d 186, 225-26, 743 N.E.2d 48, 72 (2000).

■ The coconspirator hearsay exception allows a statement to be admitted against any or all coconspirators where the declaration was made during the course of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 141, 705 N.E.2d 850, 881 (1998). Statements made in furtherance of a conspiracy include those that have the effect of advising, encouraging, aiding or abetting its perpetration. *Kliner*, 185 Ill. 2d at 141, 705 N.E.2d at 881. To establish a *prima facie* showing of conspiracy, the State must prove by a preponderance of the evidence (independent of the coconspirator's hearsay statements) that: (1) two or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) one or more acts were done by one or more persons in furtherance of the conspiracy. *People v. Brown*, 341 Ill. App. 3d 774, 783, 793 N.E.2d 75, 82 (2003). Direct evidence of an agreement is not necessary for a conspiracy conviction; agreement between coconspirators may be inferred from their concerted acts towards a common goal, including all surrounding facts and circumstances. *People v. Batrez*, 334 Ill. App. 3d 772, 783, 778 N.E.2d 1182, 1192 (2002); *People v. Morgason*, 311 Ill. App. 3d 1005, 1013, 726 N.E.2d 749, 755 (2000).

The existence of a conspiracy therefore must be proven independently of the testimony that Bunch made statements encouraging defendant to shoot Bell. The State argues that the conspiracy agreement between defendant and Bunch existed circumstantially, represented in large part by the car trip by both men to Bunch's apartment and the retrieval of Bunch's weapon. Having considered the testimony apart from the statements made by Bunch, we conclude that the State proved by a preponderance of the evidence that defendant and Bunch were coconspirators. "Because of the clandestine nature of conspiracy, Illinois courts permit broad inferences to be drawn from the circumstances, acts, and conduct of the parties," and the suspicious nature of the activities of alleged coconspirators can be sufficient to prove a joint venture. *Batrez*, 334 Ill. App. 3d at 783-84, 778 N.E.2d at 1192-93. Hunt testified that a few hours before the shooting, defendant

and Bell fought across the street. Bunch and defendant went to Bunch's apartment together and returned with Bunch's gun. When they discussed the fight later, defendant told Bunch that he would put Bell "to sleep" if Bell started any more trouble, and defendant took possession of the gun. In addition, Bunch helped defendant conceal the weapon after the shooting. Officer Fouch testified that after the shooting, Bell told him that defendant had given it to "his boy" who went inside, and a detective testified that the gun was found in a couch in defendant's apartment.

▆ Defendant argues that his acquisition of the gun from the table in his apartment was a "preventive or self-defensive posture" to protect him in case of a further dispute with Bell and that the move was not part of a criminal conspiracy. However, the testimony belies defendant's contention. Hunt testified at trial that defendant picked up the gun after Bunch removed the weapon's bullets and reloaded them, and that defendant said he would "pop" (shoot) Bell if Bell "kept f------ with him." Defendant told Detective Van Witzenburg and Assistant State's Attorney Key that he told Bunch and Hunt he would hurt Bell if any more arguing took place. These facts establish an inference, by a preponderance of the evidence, that Bunch and defendant intended to shoot Bell and, in obtaining the gun from Bunch's apartment and making it available to defendant, engaged in a common plan to do so and committed an act in furtherance of the conspiracy. Accordingly, it was not error for the court to admit Bunch's statements as coconspirator declarations, and the statements therefore were not inadmissible under *Crawford*.

Defendant next contends that the trial court erred in suppressing evidence of Bell's prior violent behavior. Before trial, the court granted the State's motion *in limine* to bar testimony by police officers that Bell was charged with misdemeanor battery and domestic battery on several occasions. Following an offer of proof, the trial court noted the testimony's hearsay nature and also observed that the complaining witnesses did not appear to pursue their complaints against Bell. In addition, the trial court barred evidence that Bell had four or five bullet fragments in his body at the time he died. The State responds that the arrest testimony was unreliable hearsay and that the testimony regarding Bell's previous gunshot wounds was irrelevant to the issue of self-defense.

Defendant contends that evidence indicates Bell's propensity for violence and was therefore relevant to defendant's claim of self-defense. The Illinois Supreme Court held in *People v. Lynch*, 104 Ill. 2d 194, 200, 470 N.E.2d 1018, 1020 (1984), that "when the theory of self-defense is raised, the victim's aggressive and violent character is

relevant to show who was the aggressor." *Lynch* held that a self-defense theory can be demonstrated by evidence of the victim's aggressive and violent character in one or both of these circumstances: (1) where the defendant claims that his own knowledge of the victim's violent tendencies affected the defendant's perceptions and reactions to the victim's behavior; or (2) to support the defendant's version of the facts when conflicting accounts are offered as to what happened between the defendant and the victim. *Lynch*, 104 Ill. 2d at 199-200, 470 N.E.2d at 1020; *People v. Luckett*, 339 Ill. App. 3d 93, 100, 790 N.E.2d 865, 870 (2003). In the second scenario, testimony regarding the victim's character is circumstantial evidence that allows the jury to assess the events in question. *People v. Bedoya*, 288 Ill. App. 3d 226, 236, 681 N.E.2d 19, 26 (1997). To be admissible under either theory, the evidence must be relevant to the victim's violent character; *i.e.*, a previous conviction for a nonviolent crime is not probative. See *People v. McGee*, 213 Ill. App. 3d 458, 469, 572 N.E.2d 1046, 1053-54 (1991).

Defendant argues that the evidence supported the reasonableness of his conduct and his perception of danger during his fights with Bell. Defendant also asserts the evidence was pertinent to a determination of who acted as the aggressor, and he argues the prior accusations against Bell reflect "violent encounters" and illustrate Bell's role as an "unrelenting aggressor." Defendant's arguments as to the first *Lynch* scenario are misplaced, since no testimony was presented that he knew of Bell's history and prior altercations before he and Bell fought. See *Lynch*, 104 Ill. 2d at 200, 470 N.E.2d at 1020 ("[o]ne can only consider facts one knows, \*\*\* and evidence of the victim's character is irrelevant to this [first] theory of self-defense unless the defendant knew of the victim's violent nature").

Accordingly, to prevail in his argument that the trial court should have admitted the evidence of Bell's prior altercations and his gunshot wounds, defendant must show that evidence was relevant for the second reason given in *Lynch*, *i.e.*, to support defendant's version of the events that immediately preceded Bell's death when there are conflicting accounts as to what happened. Defendant contends that the proffered testimony demonstrates Bell's "violent character" and supports his claim that he shot Bell in self-defense. It is irrelevant under this scenario whether defendant knew of Bell's prior behavior at the time of their encounter. *Lynch*, 104 Ill. 2d at 200-01, 470 N.E.2d at 1020; *Bedoya*, 288 Ill. App. 3d at 236, 681 N.E.2d at 26.

■ The admissibility of evidence is within the sound discretion of the trial court, and the court's ruling will not be reversed absent an abuse of that discretion. *People v. Coleman*, 347 Ill. App. 3d 266, 269, 806 N.E.2d 1113, 1117 (2004). We conclude that the trial court properly

excluded the evidence of the complaints against Bell and his gunshot wounds. In finding the testimony inadmissible, the trial court noted *People v. Huddleston*, 176 Ill. App. 3d 18, 27-28, 530 N.E.2d 1015, 1021-22 (1988). In *Huddleston*, the trial court granted the prosecution's motion *in limine* to exclude a police officer's testimony that he arrested the decedent for battery after the decedent's wife told the officer the decedent " 'hit her with his hand a couple of times.' " *Huddleston*, 176 Ill. App. 3d at 28, 530 N.E.2d at 1022. The defense sought to introduce the testimony to corroborate the defendant's claim that the decedent was the aggressor and that the defendant acted in self-defense when he shot the decedent the night after that domestic dispute. *Huddleston*, 176 Ill. App. 3d at 27, 530 N.E.2d at 1021. The trial court noted that it would have allowed the wife's direct testimony if a battery conviction had been obtained but noted that the facts only indicated the decedent's arrest. *Huddleston*, 176 Ill. App. 3d at 27, 530 N.E.2d at 1022. The court did not allow the officer's testimony as to an injury that the officer did not witness, and the appellate court affirmed. *Huddleston*, 176 Ill. App. 3d at 28, 530 N.E.2d at 1021-22. Likewise, the proffered evidence in this case involved arrests, not convictions, and none of the complaining witnesses offered live testimony as to Bell's violent tendencies or pursued their complaints against Bell in court.

*Lynch* noted that convictions for violent crimes "are reasonably reliable evidence of a violent character." *Lynch*, 104 Ill. 2d at 201, 470 N.E.2d at 1020-21. Here, it was not alleged that the battery charges against Bell resulted in convictions. Defendant contends that *Lynch*, *Huddleston* and similar cases have not expressly required a conviction to establish the violent behavior of a victim. However, as defendant acknowledges, this court has held that "evidence of a victim's mere arrest is inadmissible since it does not indicate whether the victim actually performed any of the acts charged." *People v. Ellis*, 187 Ill. App. 3d 295, 301, 543 N.E.2d 196, 200 (1989). Defendant attempts to distinguish *Ellis* by stating that *Ellis* involved a "bare arrest" and not the absence of a conviction; however, for these purposes, we find no difference between the two, since an arrested person lacks a conviction without further action by the State. We recognize that a prior altercation or an arrest, without a conviction, can be adequate proof of violent character when supported by firsthand testimony as to the victim's behavior. See *Bedoya*, 288 Ill. App. 3d at 235-36, 681 N.E.2d at 26; *People v. Hanson*, 138 Ill. App. 3d 530, 536-38, 485 N.E.2d 1144, 1149-50 (1985). However, *Lynch* and its progeny unquestionably hold that proof is needed that the victim committed the crimes. A conviction is persuasive proof of that fact.

Here, Bell was arrested on several battery charges but was not convicted of those crimes. No eyewitness testimony was offered as to Bell's violent character. At the very least, further testimony was needed to prove Bell's violent behavior. For the same reason, the gunshot wounds revealed by Bell's autopsy are not probative of his role in his fatal altercation with defendant, since the wounds do not prove or disprove any violent tendencies or mandate a conclusion that his injuries resulted from his own acts of aggression. For those reasons, the trial court properly excluded that evidence.

■ We next turn to defendant's argument that the trial court committed reversible error in refusing the defense's request to instruct the jury on the serious provocation theory of second degree murder. The State again asserts that defendant has failed to include the issue in his posttrial motion, thus requiring us to consider defendant's contentions under the plain error rule that this court previously invoked. Defendant responds that waiver is inapplicable because his counsel argued to the trial court that the jury be instructed on both theories of second degree murder and because counsel also included "the denial of a fair trial" in defendant's posttrial motion. However, we do not find the use of that boilerplate phrase provides the specificity to preserve defendant's contention for appeal. See *People v. Willis*, 241 Ill. App. 3d 790, 797, 609 N.E.2d 709, 713 (1992). Moreover, for the plain error rule to apply, there must have been error in the trial court proceedings. *Chapman*, 194 Ill. 2d at 226, 743 N.E.2d at 72. Having reviewed the evidence, we find that no error occurred on this point.

The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the facts so they can reach a correct conclusion according to the law and the evidence. *People v. Hall*, 347 Ill. App. 3d 429, 430, 807 N.E.2d 1251, 1252 (2004). A person commits second degree murder if one of two mitigating circumstances exists at the time of the killing: (1) he is acting under a sudden or intense passion resulting from serious provocation by the victim but negligently or accidentally causes the victim's death; or (2) he believes the circumstances justify his killing of the victim but his belief is unreasonable. 720 ILCS 5/9—2(a) (West 2000). In the instant proceeding, the jury was instructed on the latter theory but not the former.

Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2(b) (West 2000). The categories of provocation that courts have recognized as sufficient to warrant a second degree murder instruction based on serious provocation are: (1) mutual quarrel or combat; (2) substantial physical injury or assault; (3) illegal arrest; and (4) adultery with

one's spouse. *People v. Page*, 193 Ill. 2d 120, 133, 737 N.E.2d 264, 272 (2000). Defendant argues that sufficient evidence was presented of mutual quarrel or combat to support a jury instruction on the serious provocation theory, citing the physical altercations with Bell and the various verbal assaults on each other.

Defendant was entitled to that instruction only if some evidence of serious provocation existed in the record which, if believed by the jury, would reduce the crime to second degree murder under that theory. *People v. Jackson*, 304 Ill. App. 3d 883, 893, 711 N.E.2d 360, 367 (1999). Defendant contends that Bell's actions provide the necessary proof of provocation, specifically Bell's kicking in the door, "charging up the staircase," pulling defendant into the street and discharging the weapon. According to defendant, after he and Bell fought across the street, Bell came to the door of his apartment and struck defendant in the head with a hammer. However, defendant's testimony that Bell acted in that manner was not the only evidence presented. Hunt testified that Bell struck defendant in the head with a hammer during the first encounter and defendant returned to the apartment bleeding from a scrape on his forehead. Hunt also stated in her grand jury testimony that several hours passed before the two men fought again and that defendant left the apartment intending to confront Bell.

Even if we were to find that Bell provoked defendant, the evidence will not support a provocation instruction where a defendant's retaliation to the provocation was disproportionate to the victim's actions and involved a deadly weapon. See *Jackson*, 304 Ill. App. 3d at 893, 711 N.E.2d at 368. Defendant testified that when Bell came to his door and threatened him with a hammer, he ran out of the apartment and in Bell's direction with a gun in his back pocket, instead of closing the door and retreating safely to his apartment. The standard of review in determining whether a trial court's submission of an instruction is erroneous is an abuse of discretion. *Hall*, 347 Ill. App. 3d at 430, 807 N.E.2d at 1252. Given the evidence presented, we cannot conclude that the trial court abused its discretion in denying the serious provocation instruction as to second degree murder.

■ Defendant's final argument follows a similar vein, namely, that the evidence supported a conviction for involuntary manslaughter rather than first degree murder. Defendant thereby essentially challenges the sufficiency of the evidence to support the jury's verdict. In considering such an assertion, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Cooper*, 194 Ill. 2d 419, 430-31, 743 N.E.2d 32, 40 (2000). Under that standard, this court will

not substitute its judgment for that of the trier of fact on issues of the *weight of the evidence or the credibility of witnesses. Cooper*, 194 Ill. 2d at 431, 743 N.E.2d at 40.

The record is replete with evidence of defendant's statements that he intended to harm Bell. The jury was entitled to give weight to that testimony. At the very least, by defendant's own admission, he armed himself with a weapon before leaving the apartment and held the weapon in the air while struggling with Bell in order to threaten him. Moreover, despite defendant's protestations that the jury lacked the opportunity to find that he displayed a lesser level of culpability, the jury was instructed on first degree murder, second degree murder (based on defendant's unreasonable belief in the use of force) and involuntary manslaughter. The jury could have found defendant guilty of a lesser offense but elected not to do so, and this court is without the authority to disturb a jury verdict where, as here, the verdict was amply supported by the evidence presented. See *People v. Nieto*, 162 Ill. App. 3d 437, 447, 515 N.E.2d 376, 382 (1987).

Accordingly, for all of the foregoing reasons, we affirm defendant's conviction and sentence. As part of this order, we grant the State's motion to assess defendant $100 as costs for this appeal.

Affirmed.

O'MARA FROSSARD, P.J., and FITZGERALD SMITH, J., concur.