THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS PANZER, Defendant-Appellant.

First District (1st Division)    No. 78-643

Opinion filed June 4, 1979.

2

James J. Doherty, Public Defender, of Chicago (John M. Kalnins, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and John R. Roe, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Thomas Panzer, together with his brother Gregory Panzer, was charged by information with the murder of Joseph A. Mendrik. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(1).) In addition, defendant was also charged with unlawful use of weapons. (Ill. Rev. Stat. 1975, ch. 38, par. 24—1(a)(7).) Prior to trial, Gregory Panzer pleaded guilty to involuntary manslaughter on the theory of accountability and was sentenced to 5 years probation. Gregory Panzer is not involved in this appeal. After a jury trial, defendant was found guilty of voluntary manslaughter and of unlawful use of weapons and, after his written motion for a new trial was denied, was sentenced to concurrent terms of 6

to 18 years for voluntary manslaughter and 3 to 9 years for unlawful use of weapons. Defendant appeals only from the conviction and sentence for voluntary manslaughter.

Defendant contends that (1) the trial court committed reversible error in (a) refusing to instruct the jury as to involuntary manslaughter, (b) allowing photographs of the deceased to go to the jury, (c) refusing to allow defendant's written confession to go to the jury, and (2) his sentence was excessive.

Frank Agnoli testified that at approximately 10:45 p.m. on November 8, 1975, he was sitting eating hamburgers with Peter Raney on the front steps of the field house of Independence Park, at the intersection of Irving Park and Springfield, when two men approached them, yelling names at them. After the two men "disappeared," defendant, who had been a friend of Agnoli for two years, drove up to the field house and got out of his car. The two men who had been yelling at them earlier reappeared, coming down Springfield from Irving Park, still yelling names at them. At defendant's suggestion, Agnoli and Raney got in defendant's car and accompanied him to the rear of defendant's house, about a half mile from the field house. Defendant told Agnoli and Raney to wait in the car and went through the gangway. Agnoli and Raney, however, left the car and walked north on Springfield back towards the park and the field house on the side of the street opposite the park. They saw walking toward them the deceased, Joseph Mendrik, and his companion Vincent Palmisano. They were the two men who had been yelling at them earlier.

At that time defendant and his brother Gregory Panzer caught up with Agnoli and Raney and passed them. Defendant and his brother, the deceased and Palmisano met at the southwest corner of Springfield and Dakin. Defendant and the deceased called each other names and cursed at each other. Agnoli at that time was behind Raney, on the right side of defendant. Defendant and deceased were a little over an arm's distance apart, arguing with each other, when deceased slapped defendant in the face with his open hand. Deceased did not have anything in his other hand. Defendant had his hands at his side. At that point Agnoli turned away for a minute, heard a shot, turned back and saw defendant holding a sawed-off shotgun in his hand. His three-quarter length green coat was open. When Agnoli saw deceased fall into the street, he, Raney, defendant and his brother started running, Agnoli and Raney running to Agnoli's house. Later that night they told the police they that knew nothing. Agnoli testified that he lied to police because he was scared.

On cross-examination, Agnoli stated that as he turned away he heard a shot. He didn't hear any conversation or words spoken between the slap and the shot. The first time he had even seen deceased and Palmisano was that night when they started calling him names. He did not remember

stating at a preliminary hearing that when he turned back after hearing the shot he saw defendant "who was shocked, holding the gun."

Vincent Palmisano testified that at approximately 10:45 p.m. on November 8, 1975, he was in Independence Park having a few beers with his friend, Joseph Mendrik, the deceased. They had been there drinking beer from about 7:30 p.m. At 10:45 p.m., as they were walking to a bar on Springfield and Irving to get some more beer, they walked past the field house. Deceased said something to the people there. After getting some beer, they returned to the corner of Springfield and Irving. Words were exchanged between the deceased and the people they had seen previously. Palmisano and Mendrik then walked back to the park. At about 11:30 p.m. they started walking down Springfield towards Irving and saw the same people coming toward them. Mendrik and Palmisano started shouting and swearing at those people.

As they reached the corner of Springfield and Dakin, they confronted defendant and his brother and Agnoli and Raney. Palmisano did not know any of them prior to that evening. Defendant and deceased exchanged words in a medium voice tone about someone named John. At that time Palmisano had an AM-FM radio in his hand, but neither he nor anyone else had anything else in their hands. Defendant's hands were down at his side. After more exchange of words, deceased slapped defendant in the face. Defendant said, "You ain't going to hit me again" or "Don't hit me." Defendant, who was wearing a green trench coat that came down below his knees, drew back and pulled out a sawed-off shotgun. Deceased said, "Go ahead and shoot me." After a lapse of about 10 to 15 seconds, defendant, who was four feet from the deceased, shot him. At that time Palmisano was standing about three feet from deceased. Defendant, his brother, Agnoli and Raney all started to run. Deceased fell back and asked Palmisano to get help. Palmisano threw his radio into the bushes and ran to the tavern on Irving Park, where he asked the people there to call the police. The police found the radio 25-30 feet from Mendrik's body. Later that night Palmisano picked defendant out of a lineup as the person who had shot deceased.

On cross-examination, Palmisano testified that he had not seen either defendant or his brother prior to the incident. He did not recall stating at the preliminary hearing that he had seen them "a couple of weeks ago." Palmisano did not see defendant open his coat. He said that defendant, whose arms were down, "picked up and backed off and shot him." Palmisano guessed defendant had the gun in his arm all the time, because he never moved his arms; he kept them down.

Peter Raney testified that at 10:45 p.m. on November 8, 1975, he was sitting with Agnoli on the front steps of the field house, eating hamburgers, when deceased and Palmisano, who were a half a block

away, shouted something at them. Defendant, whom Raney had known for three years, drove up in his car. Deceased and Palmisano returned, shouting at them. Defendant told Raney and Agnoli to get in his car. They did and drove half a mile to the back of defendant's house, parking behind the garage. Defendant told them to wait, but after he went into the gangway Raney and Agnoli started walking north on Springfield back to the park. While walking they saw the deceased and Palmisano. At that point defendant and his brother passed them from behind and approached deceased and Palmisano, defendant and deceased shouting at each other. The six met at the southwest corner of Springfield and Dakin. Deceased and defendant exchanged a few words in an angry tone of voice. Deceased slapped defendant with his open hand. Defendant stepped back, brought a sawed-off shotgun up from his hip and shot the deceased in the chest. Raney did not recall words being exchanged between the slap and the shot. After the shooting, Raney and Agnoli ran to Agnoli's house. Defendant and his brother also ran. Raney later told the police that he did not see anything; he did that because he was scared.

On cross-examination, Raney stated that during the argument between defendant and deceased defendant's hands were at his sides. Raney did not see the shotgun prior to the time defendant raised it. Raney further testified that when defendant took him and Agnoli to defendant's home, defendant did not say he was going to get a shotgun to shoot someone.

Investigator Richard A. Schak of the Chicago Police Department testified that the next evening he arrested defendant in his home and informed him of his rights. Defendant signed a consent to search form. Investigator Schak recovered a sawed-off bolt action shotgun from between cushions on a couch in the garage at defendant's home.

Edward Ozog, an assistant State's Attorney, testified that on November 10, 1975, after advising defendant of his rights, he took a question and answer statement from defendant. The statement was read to the jury.

In the statement defendant, in response to questions, said that he was 18 years old and had finished the second year of high school. About 11 p.m. on November 8 he drove to Independence Park, where he met Frank Agnoli and Peter Raney. He also saw deceased and Vincent Palmisano, who pointed at him and started running towards him. Defendant had not seen Palmisano before, but had previously seen deceased a month or six weeks earlier. One of these two had his hand in his pocket and the other had a quart of beer. Defendant drove Agnoli and Raney to defendant's house, where he went to his garage and put the gun under his jacket. Defendant met his brother as defendant was coming out of the gangway. Raney and defendant's brother followed defendant to

the corner of Springfield and Dakin. Until defendant pulled out the gun, no one knew he had a gun.

Defendant stated that after arriving at the corner:

"Well, he [deceased] was like threatening me and we were sitting there talking about little John, whoever he is, and that he set him up, and that he'd like to talk to him, and he said if I didn't tell him he'd kill me, you know. And then he threw a punch at me and he hit me in the mouth and I was holding the shotgun and when he hit me I shot him."

Deceased had nothing in his hand but "like he was holding something or carrying something" in his right front pocket.

Defendant's statement continued:

"Q. How many times did he strike you?

A. Just once.

Q. Where did he strike you?

A. In the mouth.

Q. With his fist or his open hand or what?

A. I think it was with his closed hand.

Q. Where did you shoot him?

A. At the corner.

Q. Where on his body?

A. In the stomach or in the chest, I wasn't aiming to shoot him, I didn't say, I'm going to kill you, I shot him when he hit me, I jerked back and that was it.

Q. Did you point the gun at him?

A. Yes.

Q. Did you pull the trigger?

A. Yes.

\* \* \*

Q. How far away from the victim were you when you shot?

A. About three feet. When I shot him he was maybe two feet away."

After the shooting, defendant ran down Springfield going south, cut through the gangway, put the gun in his garage and ran upstairs to his room.

It was stipulated that (1) if Dr. Joseph Claparols, a coroner's pathologist, were to testify he would state that deceased died of a gunshot wound to the front of his upper right chest with an overall directional force backward through the right lung; (2) if George Christopolous, a toxicologist, were to testify he would state that an analysis of deceased's blood revealed the presence of 198.0 milligrams ethanol present in the blood; (3) if Investigator David Shields were to testify he would state that

the barrel length of the weapon in question is between nine and 10 inches; and (4) defendant was 20 years old.

Defendant contends that the trial court committed reversible error when it refused to instruct the jury on involuntary manslaughter. We disagree. Section 9—3 of the Criminal Code of 1961 defines involuntary manslaughter as an unintentional killing of an individual without lawful justification where the "acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual" and are done "recklessly." (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a).) Section 4—6 of the Criminal Code of 1961 provides (Ill. Rev. Stat. 1975, ch. 38, par. 4—6):

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. * * *"

■■■ Defendant argues that there was evidence here which, if believed by the jury, could be construed to be reckless conduct within section 4—6 and that, therefore, the trial court should have instructed the jury on involuntary manslaughter. Defendant points (1) to his assertion in his statement that "I wasn't aiming to shoot him, I didn't say, I'm going to kill you, I shot him when he hit me, I jerked back and that was it," (2) to the testimony of Agnoli and Raney that there were no words exchanged between the slap and the shot, and (3) to Agnoli's testimony that after the shot defendant was "shocked" as sufficient evidence to require such an instruction. This argument is without merit. Defendant's statement that he was not aiming to shoot deceased and that he didn't say to deceased, "I'm going to kill you" does not provide a sufficient basis for instructing on involuntary manslaughter. (*People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829.) Particularly is this true in view of defendant's further statement that he pointed the gun at deceased and pulled the trigger with deceased about two feet away. This precludes any claim defendant's conduct was reckless rather than intentional. Nor does the testimony of Agnoli and Raney referred to aid defendant. The evidence shows that defendant, after being called names by the deceased, went to his home, picked up a sawed-off shotgun and returned to the park. When defendant and deceased confronted each other, defendant held the gun at his side. After being slapped, defendant stepped back, brought up the gun, pointed it at and shot deceased, who was about two feet away. This does not show reckless conduct. We conclude that there was no evidence to justify the submission of an involuntary manslaughter instruction.

■■ Defendant points to the fact that as to defendant's brother Gregory, who was a co-defendant charged on the theory of accountability, the trial court accepted and the State stipulated to a plea of guilty to involuntary manslaughter as an admission by the State that there was evidence of involuntary manslaughter as to defendant. Gregory's plea cannot be so construed. Apparently, although the record does not so show, Gregory's plea of guilty to involuntary manslaughter was the result of a plea bargain. The State may have had a legitimate reason for accepting a plea of guilty to a lesser charge. It does not prove that he was not guilty of murder (or of voluntary manslaughter) or that he could not have been convicted of either charge on the theory of accountability. (See *People v. Hines* (1975), 28 Ill. App. 3d 976, 986, 329 N.E.2d 903, *appeal denied* (1975), 60 Ill. 2d 599.) The trial court properly refused to give the jury instructions on involuntary manslaughter.

Defendant also contends that the trial court improperly allowed a color photograph of the deceased to go to the jury. He argues its sole purpose was the influence the jury. We find that its admission was not improper.

■■■ Whether a photograph of a deceased person should be admitted in evidence normally rests within the discretion of the trial court and if such a picture has sufficient probative value it may be admitted in spite of the fact that the photograph may be gruesome and inflammatory. (*People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827.) Here, defendant claimed that he wasn't "aiming to shoot" deceased. The photograph was probative as to the truth or falsity of this contention, because it shows that the shotgun blast struck deceased in the middle of the right part of his chest. It corroborates the testimony of Agnoli, Raney and Palmisano, as well as defendant's statement after defendant was slapped by deceased defendant stepped back, brought up the sawed-off shotgun, aimed it at deceased and pulled the trigger. All this evidence shows that the shooting was intentional. "Evidence concerning the location of the wound is certainly relevant to the issue of whether defendant shot [deceased] intentionally or accidentally." *People v. Radford* (1978), 65 Ill. App. 3d 107, 113, 382 N.E.2d 486, *appeal denied* (1979), 72 Ill. 2d 584.

■■ Defendant further argues that prejudicial error was committed when the trial court refused to allow defendant's statement to go to the jury. We disagree. Whether the statement of a defendant should go to the jury is, as is also the case as to physical exhibits, within the sound discretion of the trial judge and the exercise of that discretion, absent an abuse to the prejudice of the defendant, will not be disturbed on appeal. (*People v. Caldwell* (1968), 39 Ill. 2d 346, 359, 236 N.E.2d 706.) The statement had been admitted into evidence and read to the jury. The trial judge, in refusing to allow the statement to go to the jury, determined that it would

place undue emphasis on one piece of evidence. We find no abuse of discretion.

■ Defendant claims that his sentence was excessive and should be reduced. The amount of a sentence is within the judicial discretion of the trial judge and "absent an abuse of discretion by the trial court a sentence may not be altered upon review." (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) On the record before us we find no abuse of that discretion.

The conviction and sentence are affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.