THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY GOLIDAY, Defendant-Appellant.

First District (6th Division)   No. 1—88—3195

Opinion filed December 6, 1991.

Randolph N. Stone, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Judy DeAngelis, Special Assistant State's Attorney, and Renee Goldfarb and Sari London, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

After a jury found defendant-appellant Jerry Goliday guilty of murder, he was sentenced to a term of imprisonment of 24 years. Defendant raises a number of issues on appeal, including: (1) whether the use of an erroneous voluntary manslaughter instruction at defendant's trial requires this court to reverse defendant's conviction and order a new trial; and (2) whether the State failed to disprove the affirmative defense of self-defense beyond a reasonable doubt. We reverse defendant's conviction and remand for a new trial.

The following testimony was elicited at trial. Defendant's girl friend, Salen Holman, lived with her mother, Ruthie May Jenkins, her child (by defendant), her brother, Dwayne Holman, and the victim, Ray Dennis, at Dennis' apartment.

Salen testified that on June 15, 1987, when she and defendant talked in the bedroom, defendant became increasingly angry when she told defendant that they could not get back together. According to Salen, defendant was drinking vodka and said "let me finish drinking my stuff because I am fixing to kick some ass." Defendant then began tugging at her shirt, and slapped her in the face. When the victim came into the room, he grabbed defendant's arm and Salen got away. Defendant chased her, swinging the bottle of vodka at her. Salen left the apartment, but defendant caught her on the street and after threatening to cut her face with the bottle, dragged her by the hair back to the apartment.

When they got to the front door, defendant proceeded into the unit, while Salen stayed outside for five or six minutes. Salen then said she observed the victim slumped over and coming up the stairs with defendant almost on his back, stabbing him with a knife several times. Salen and her brother then ran out of the apartment and flagged down a police car. When Salen returned to the apartment, she saw the victim on the bed with her mother wiping his head with a towel.

Dwayne Holman testified that when defendant came back to the apartment, defendant punched the victim in the head, causing the victim to collapse. Dwayne ran to the dresser and got a knife and he and defendant tussled, during which time Dwayne stabbed defendant three times. After defendant had been cut, Dwayne dropped the knife to the floor. Defendant picked it up and then stabbed the victim twice in the head as the victim was walking to his bedroom. The victim tried to get out the door, but defendant jumped on the victim's back and continued to stab him in the head. Dwayne then grabbed his sister, and they ran until they saw a squad car. Dwayne acknowledged on cross-examination that he never told the police that he had gotten the knife first. Dwayne Holman testified further that at the time of trial he was in the custody of the juvenile Department of Corrections at St. Charles. He was there for violation of probation and a parole hearing was forthcoming. His delinquent adjudications for theft, robbery and armed robbery were pointed out on cross-examination.

Ruthie May Jenkins, Salen's mother and the victim's girl friend, testified to substantially the same events as Salen and Dwayne. She said that when Dwayne woke her and the victim, she saw defendant chasing Salen with a bottle in his hand. She told Dwayne to call the police, but then defendant returned to the apartment and hit the victim in the eye. When the victim fell toward her at this time, she went to get a towel to wipe the blood. When she returned, defendant and

the victim were outside of the apartment. The victim then staggered back into the apartment, bleeding. Ruthie tried to get the victim on the bed, but defendant came back in and repeatedly stabbed the victim in the head again. When she tried to go to the victim's aid, defendant hit her, knocking her unconscious. Then, the police arrived. Ruthie did not inform the police that Dwayne was the first to get the knife, and she did not see Dwayne stab defendant although she did see defendant pick the knife up off the floor.

Chicago police officer Dennis Jackson testified that at about 6:40 a.m. on June 15, 1987, he saw two teenagers run up to his squad car and they informed him that there had been a stabbing at 427 East Oakwood. They proceeded to the location, where he observed the victim's face covered with blood. An ambulance was summoned, the knife was pointed out to Jackson, and he was told that the offender was defendant. Jackson was also advised where defendant lived and what defendant was wearing.

Dr. Edmund R. Donoghue, a pathologist who performed the autopsy on the victim, testified that the victim died as a result of multiple stab wounds to the head, back, face and shoulders.

Chicago police officer Gil Erbacheo testified that on June 15, 1987, at about 7 a.m. he placed defendant under arrest. Defendant was able to walk on his own, but was brought to Provident Hospital. Defense counsel attempted to elicit from Officer Erbacheo what defendant had said at the time he was arrested, but the trial court disallowed the testimony. Likewise, defense counsel was not allowed to elicit from the officer whether defendant was given shots or pills at the hospital.

In his own behalf, defendant testified that early in the morning on June 15, 1987, defendant, who was 17 at the time, walked to Dennis' apartment. Defendant had been there many times as a guest before. On this occasion, defendant was upset due to Salen having broken up with him two days before. Earlier in the evening, defendant had been drinking with a friend. Defendant arrived at the apartment at about 2:30 a.m., and was let in to the apartment by 16-year-old Dwayne Holman.

When defendant arrived, he found Salen, Ruthie May and Ray Dennis drinking in a bedroom. Defendant spoke with the group for about a half hour, and then defendant and Salen went into Salen's bedroom to feed the baby. The conversation turned to why Salen had broken up with defendant. When Salen refused to explain the presence of a new necklace she was wearing, defendant slapped her more than once. The other individuals at the apartment came to the room,

but Salen ran from the apartment with defendant following her. Defendant then pulled Salen back to the apartment.

According to defendant, when he reentered the apartment, the victim struck defendant on the left shoulder with a baseball bat. Defendant and the victim tussled with the bat, when Dwayne came at defendant from behind and stabbed him with a knife. Defendant punched Dwayne and Dwayne dropped the knife. The victim continued to swing at defendant with the bat. Defendant picked up the knife, rushed at Dennis and stabbed him once beneath the left shoulder. The two men then struggled over the knife, and the altercation moved to a bedroom. During the struggle, defendant stabbed the victim several more times. Defendant's finger was cut, and he testified that he was fighting for his life. Eventually, the victim gave up.

Defendant then dropped the knife and ran from the apartment. When he got home, his mother saw that he was injured and called the police and an ambulance. The police came and took defendant to the emergency room at the hospital. Defendant testified that he was medicated at the hospital and went to sleep. Later, defendant was awake but still drowsy when he spoke with the police and an assistant State's Attorney. Because defendant was so sleepy, he could not remember what he said at this time.

Defendant denied that he hit Ruthie or that he stabbed the victim while the victim was on the ground. Defendant testified that he stabbed the victim while the victim faced him. Defendant acknowledged that at the time of the occurrence, he weighed about 200 pounds, while the victim weighed about 142 pounds. Defendant considered himself to be the victim, although defendant admitted that he did not report what happened to the police.

The parties stipulated that if Russel Born were to testify, he would state that on September 7, 1988, he had a conversation with Dwayne Holman in the conference room of the court room. During this conversation, Dwayne stated that both he and the victim were "tusseling [sic]" with defendant after Holman had stabbed defendant. Further, the stabbing of defendant occurred in the kitchen area.

Additionally, it was stipulated that Officer Rooks would testify that he spoke with Ruthie May Jenkins at the scene of the occurrence. Jenkins told Rooks that she had found the knife involved lying on the floor near the television.

In rebuttal, the State called Assistant State's Attorney Peter Fischer, who testified that on June 15, 1987, he was assigned to the felony review unit of the State's Attorney's office. Fischer was assigned the instant case and went to Provident Hospital, where he spoke to

defendant. According to Fischer, defendant waived his *Miranda* rights and related the following to Fischer. Defendant told Fischer that he had struck his girl friend several times, that Dwayne Holman came to the room and defendant told Dwayne to leave. He and Salen continued to argue, with the argument moving from the bedroom to the kitchen. Defendant further told Fischer that Dwayne came into the kitchen area with a knife, accompanied by Ruthie and the victim. Dwayne then jumped on defendant and stabbed him, and defendant hit Dwayne. Dwayne dropped the knife, which defendant picked up. Then, according to Fischer, defendant stated that he turned toward the victim, who approached defendant with a baseball bat. Defendant told Fischer that he stabbed the victim about five times, dropped the knife and ran to his mother's house. Fischer said that the conversation lasted about 10 minutes, and that during the conversation, defendant appeared alert and not drowsy.

The first issue we address is whether the use of an erroneous voluntary manslaughter instruction at defendant's trial requires this court to reverse defendant's conviction and order a new trial.

The State first argues that under the facts of this case, defendant was not entitled to a voluntary manslaughter instruction in the first place. The record, however, clearly reveals evidence, which if believed by the jury, entitled defendant to such an instruction.

■■ In *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, the Illinois Supreme Court held that the giving of a similar instruction to the jury as was given in this case was error. *Reddick* errors, however, can still be harmless. In the recent case of *People v. Shields* (1991), 143 Ill. 2d 435, 445, 575 N.E.2d 538, the supreme court observed "our subsequent decisions have recognized that the errors identified in *Reddick* may indeed be harmless in appropriate cases." In rejecting a rule of automatic reversal, the court observed that "the instructions should not be judged in artificial isolation but must instead be considered in light of the record as a whole, including the evidence and arguments presented to the jury." (143 Ill. 2d at 446, citing *Cupp v. Naughten* (1973), 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373, 94 S. Ct. 396, 400.) Here, the error, which is constitutional in nature, will be deemed harmless if it can be shown beyond a reasonable doubt that it was harmless. See *Shields*, 143 Ill. 2d at 446-47, citing *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828.

■ In our view, the instructional error in this case was not harmless beyond a reasonable doubt. While there clearly was sufficient evidence which, if believed, would support the conviction, there was

other evidence which, if believed, would support a claim of unreasonable belief manslaughter. Defendant did, after all, testify that the victim struck him with a baseball bat, that he was stabbed by Dwayne Holman as he struggled, and that the victim again came at him with the bat. Further, the victim's alcohol level was .336. Other factors which support a holding of lack of harmlessness include the inebriation of the witnesses, the impeachment of Dwayne and prior inconsistent statements of the occurrence witnesses. Dwayne, for example, had told Russell Born that at the time of the stabbing, both he and the victim were struggling with defendant, contrary to his trial testimony. Although both Dwayne and Salen testified that Ruthie May was intoxicated, Ruthie May denied that either she or the victim was intoxicated at the time. Further, there was no physical evidence supporting the occurrence witnesses' version of the incident, that stabbings occurred outside the apartment in the hall. Accordingly, we are unable to say with certainty that the trial court's result would have been the same had a proper instruction been given. See *People v. Harris* (1989), 133 Ill. 2d 118, 547 N.E.2d 1241; *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.

We next address whether the State failed to disprove the defense of self-defense beyond a reasonable doubt. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) Defendant argues that some of the "physical evidence" (apparently the location of bloodstains) contradicts the occurrence witnesses' version of the incident. Also, defendant notes that Dwayne Holman was impeached at trial, and that Ruthie May Jenkins was intoxicated at the time of the incident. Thus, according to defendant, the defense of self-defense was not disproved beyond a reasonable doubt.

■ The requirements for determining whether the use of force is justified as self-defense are as follows:

" '(1) [T]hat force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable.' " (*People v. Crum* (1989), 183 Ill. App. 3d 473, 482, 539 N.E.2d 196, quoting *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499.)

(See Ill. Rev. Stat. 1987, ch. 38, par. 7—1.) The determinative question where deadly force is used is whether defendant's belief that it

was necessary to use deadly force was reasonable under the circumstances. *People v. Collins* (1989), 187 Ill. App. 3d 531, 534, 543 N.E.2d 572.

■ After reviewing the record *sub judice*, we conclude that there was sufficient evidence to support defendant's conviction. When an appeals court reviews the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) Discrepancies in the testimony of witnesses go to the issue of credibility, which must be judged by the trier of fact. (*People v. Thomas* (1981), 96 Ill. App. 3d 443, 450, 421 N.E.2d 357, 363.) Where there is a disputed question as to self-defense, it is a question for the jury to decide (see *People v. Feierabend* (1981), 98 Ill. App. 3d 731, 736, 424 N.E.2d 765), and it is for the jury to decide what witnesses to believe and what weight to give their testimony. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267.

Here, while defendant was clearly tussleing with and stabbed by Dwayne Holman, the witnesses testified that defendant was not threatened by the victim in the manner defendant testified. The fact that blood may have been found in areas of the apartment not specifically accounted for in the witnesses' testimony is not particularly troublesome, as both the defendant and the victim were stabbed repeatedly, the victim staggered within the apartment and the incident, by all accounts, went from room to room. The credibility of the witnesses and defendant was for the jury, and we hold that the jury's resolution was not so improbable or unsatisfactory as to require outright reversal.

We have considered the other issues defendant presents and consider them unlikely to recur or without merit.

Accordingly, the judgment of the circuit court is reversed and remanded for a new trial.

Reversed and remanded.

EGAN and LaPORTA, JJ., concur.