# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Hayes*, 2011 IL App (1st) 100127

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURMILLER HAYES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-0127 |
| Filed | November 15, 2011 |
| Rehearing denied | December 12, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated battery with a firearm was upheld over his contentions that he was not proved guilty beyond a reasonable doubt where the prosecution witnesses admitted lying to the police and his testimony that he acted in self-defense was unimpeached and corroborated by the physical evidence, that his counsel was ineffective in failing to introduce evidence of the victim's violent character and that the prosecutor's closing argument improperly distracted the jury from the relevant facts. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-25627; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Melinda Grace Palacio, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Cunningham and Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Curmiller Hayes, appeals his conviction after a jury trial of aggravated battery with a firearm and his sentence of 10 years' imprisonment. On appeal, Hayes contends (1) the State did not prove him guilty beyond a reasonable doubt where State witnesses admitted lying to the police and Hayes' testimony that he acted in self-defense was unimpeached and corroborated by the physical evidence; (2) he was denied effective assistance of counsel where trial counsel failed to introduce admissible evidence of the victim's violent character to support Hayes' theory of self-defense; and (3) the prosecutor improperly remarked during closing argument that the jury would receive a copy of prior inconsistent statements of defense witness Erica Teasley, which placed undue focus on that evidence and distracted the jury from the relevant facts of the case. We affirm.

¶ 2                            JURISDICTION

¶ 3    The trial court sentenced Hayes on December 17, 2009, and he filed a timely notice of appeal on December 17, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4                            BACKGROUND

¶ 5    In the early morning hours of November 24, 2007, shots were fired between Hayes and John Morrissette at the Hole-N-Da-Wall, a private social club located at 813 S. Pulaski in Chicago. Hayes was charged with attempted murder and aggravated battery with a firearm of Morrissette and John Wilson.

¶ 6    At Hayes' jury trial, Bertha Morrissette testified for the State. Bertha stated that she was part owner of the club, and on November 24, 2007, a woman known as Thumb was there with six or seven others to celebrate her birthday. Hayes was part of the group celebrating

Thumb's birthday. Bertha observed Hayes and a patron named Cowboy pushing each other around, and some of the men at the club broke up the fight. The women at the party with Hayes started pushing him out the door, but he did not leave quietly. Hayes was "fussing and fighting and cursing," trying to get back into the club. After finishing their drinks, the other members of Thumb's party also left the club.

¶ 7    The club had a main exterior door, and after proceeding down a small vestibule, there was an interior glass and aluminum door. After the Thumb party left, Bertha locked the interior door. About 30 minutes later, Hayes returned to the club and started banging on the glass window of the interior door. Bertha informed him that the club was closed and they were getting ready to leave. Hayes left through the main door, but soon after returned and kicked open the interior door. He had a pistol in his hand. Hayes then said, "now what" and fired the gun down the middle of the aisle. Bertha fell to the floor and heard two or three more shots. Hayes then ran out of the club. Bertha did not see anyone else with a gun that night.

¶ 8    After Hayes left, Bertha saw that her boyfriend, John Wilson, had been shot in the foot. She grabbed some towels to wrap up his foot. When police came in, they pulled her aside to ask her questions. She had heard that a person she knew as Lil Hole followed the shooter after he left the club. At the police station, Bertha identified Hayes in a lineup.

¶ 9    Bertha stated that she could no longer close the interior door after the incident although the door showed no signs of physical damage; only the lock on the door was affected. She also denied that her son, John Morrissette, kept a shotgun at the bar of the club and denied he shot a gun that night. She acknowledged that her son is a convicted felon and is not supposed to have a gun.

¶ 10   John Wilson testified that on November 24, 2007, he was in a relationship with Bertha, although at the time of trial they were no longer dating. On that date, he went to the club and played some poker on the machine, drank a beer then went to the back room to sleep. Later, Wilson returned to the bar and got another beer. A man he subsequently identified as Hayes kept trying to get into the club but Bertha told him it was closed. Hayes went out, then came back to the interior door, which he kicked open. He walked toward the bar, reached down to his side and pulled out a pistol. Wilson testified that he did not see anyone else with a gun at that point. When Hayes was about three or four feet away, he shot Wilson in the top of his right foot. Wilson grabbed his leg and rolled under the nearby pool table. Although he could not see what was happening while he was under the pool table, Wilson did hear a few more shots and another person crawled on top of him under the table. When the shooting stopped and he heard people say, "he's gone," Wilson took off his boot, which was full of blood. He then saw John Morrissette at the bar holding a pump shotgun. Bertha asked her son, "[D]id you get him?"

¶ 11   The police and paramedics arrived, and Wilson was transported to Mt. Sinai Hospital, where a doctor informed him that he had 22 or 23 holes in his foot. Wilson admitted that he did not tell police that night that he had seen Morrissette with a shotgun because he was in a relationship with Bertha at the time. Before the shooting, he had never seen Morrissette handling the shotgun although he knew he kept a shotgun in the disc jockey (DJ) booth. He

had also informed Bertha about the gun before the shooting.

¶ 12     John Morrissette testified that he has a 2006 conviction for burglary and a 2008 conviction for aggravated unlawful use of a weapon. In the early morning hours of November 24, 2007, he was DJ for a party at the club. Although he was not aware of any altercation involving Hayes, he did observe some ladies trying to get him out of the club. Hayes, however, was wrestling and scuffling because he did not want to leave. Hayes was very angry. Morrissette stated that he did not help to escort Hayes out of the club, nor did he ever punch him. The other members of his party stayed for another 20 minutes before leaving.

¶ 13     Approximately 30 minutes later, Hayes returned, "bamming" on the interior door. Morrissette told him that the club was closed and made a motion across his neck indicating that fact. Morrissette testified that it was his first face-to-face encounter with Hayes. Morrissette returned to the DJ stand to play a couple more songs when Hayes kicked the door, which flew open. Hayes had a revolver and fire was coming from the barrel of the gun. People were running and ducking. After seeing that Hayes had a gun, Morrissette grabbed his shotgun, which he kept in the DJ booth for protection. Hayes had fired the first shot and Morrissette tried to aim at Hayes, but then Wilson's niece ran past and he accidentally shot toward the floor. Hayes shot once more before running away. Morrissette stated that he was shot in the foot, and he later discovered that his shot hit Wilson in the foot.

¶ 14     When police arrived, Morrissette did not tell them he had a shotgun because he was on felony probation at the time and he was not supposed to be around weapons. Doctors at Rush Hospital later removed the bullet from his foot. Morrissette identified Hayes in a lineup at the police station on November 24, 2007. He did not tell the investigator that he had a shotgun that night, nor did he tell the assistant State's Attorneys. Morrissette only admitted having the gun when he discovered that Wilson would testify at trial that he had a gun.

¶ 15     Ozay McNeely testified that on November 24, 2007, between 1:30 and 2 a.m., he was at the club talking to someone he later discovered was Hayes' sister-in-law. About four or five other women were also present. Hayes kept asking him why he was "messing" with his sister-in-law and McNeely told him that he had known her for a long time. The women tried pushing Hayes out of the way, and McNeely kept talking to them. After bringing the women some drinks, McNeely had no other contact with Hayes. McNeely left the club about an hour or two later and he sat alone in his car, smoking and listening to music. While in his car, McNeely observed Hayes and the other women come outside. The women were trying to keep Hayes from going back inside the club. Hayes then went to his car, opened the trunk, and took out a jack iron. The women stopped him from going back into the club. Hayes then threw the jack in the back of his car, got into the car, and drove away.

¶ 16     McNeely returned to the club for about an hour before going out to his car to smoke a cigarette. After a while, someone named Sharon came out and pointed to a car driving away. She said that "he" had just fired some shots in the club. McNeely noted that the car was the same one he had seen Hayes drive off in earlier. McNeely, however, never saw Hayes come back to the club nor did he see who was driving the car now. He followed the car and dialed 911. He told the operator that he was following a person who had fired shots in a tavern. McNeeley remained on the phone. He followed the car until he saw Hayes get out of the car

and walk to a large building. Hayes shouted at a woman on the third floor and then went into the building. When he came out of the building, about 10 to 12 police cars were coming and he started to run. McNeely pointed out the direction Hayes was running and police began their chase. Police soon returned with Hayes and asked McNeely to identify him. At trial, McNeely denied telling police that he had actually witnessed the crime. He also testified that he knew John Morrissette but had never seen him with a shotgun.

¶ 17     Chicago police officer Carmen Hernandez and her partner were working the early morning hours of November 24, 2007, when they heard a call of a person shot and a witness following the offender. Following the directions, they arrived at 3500 North Franklin where they found McNeely. McNeely told them he was a witness to the shooting and pointed out Hayes, who was 25 to 30 feet away. They joined seven or eight other officers in chasing Hayes. They shouted, "Police, stop" but Hayes kept running. As Officer Hernandez and her partner got halfway down Drake, Hayes popped out through a yard and tripped in front of the officers. Hernandez and her partner detained Hayes, placed him in a squad car, and brought him to McNeely, who identified him as "the guy that shot people in the club."

¶ 18     Detective Kevin Bor and his partner also monitored the call of a private citizen following an offender on November 24, 2007. They observed Hayes being placed into custody and they met with McNeely, who told them that he had witnessed the shooting. When they arrived at the club, they observed that the interior door did not appear damaged. There was blood on the floor immediately inside the door and a pool of blood by some stools and tables. There was another pool of blood near the pool table. Both pools contained metal fragments, which the police recovered. They did not recover a weapon, however. Bor interviewed Bertha, John Morrissette, and John Wilson and no one mentioned that John Morrissette had a shotgun, nor did Morrissette ever mention firing a shotgun. At the police station, forensic investigator Strzepek conducted a gunshot residue test on Hayes. A metal object was removed from John Morrissette's foot on November 28, 2007.

¶ 19     Robert Berk, who works in the trace evidence section of the police crime lab, examined the swabs taken from Hayes and determined that Hayes had discharged a firearm, contacted a gunshot residue (GSR)-related item or had his right hand in the environment of a discharged firearm. Leah Kane, a firearm and toolmark examiner at the crime lab, determined that the metal object taken from John Morrissette's foot was a 9-millimeter/.38-caliber bullet. The metal fragments found on the floor did not contain any characteristics making them suitable for comparison.

¶ 20     Erica Teasley testified for the defense. She stated that she and Hayes lived at 2922 West Fillmore with their three children. Hayes' mother and father lived on the first floor. On November 24, 2007, she and her sister, Thumb, went to the club to celebrate both their birthdays with friends. Hayes arrived about a half hour later. Around 3 a.m., she and Hayes got into an argument because he wanted to leave but she did not. They did not hit each other. John Morrissette then came over and punched Hayes, who fell down. Teasley knew Morrissette as the bouncer of the club. Hayes did not punch back, but Morrissette asked him to leave. Hayes left and drove off while Teasley and her group stayed another five minutes before leaving.

¶ 21        Teasley testified that she did not know McNeely, but she knew a person by the name Lil Hole. She admitted that Lil Hole and Thumb had a conversation at some point, but denied that Hayes had an argument with Lil Hole. She did not recall whether she told police that Hayes had a conversation with an unknown black male or that Hayes pushed that person who then punched Hayes in the face. She spoke with an assistant State's Attorney, but did not recall whether she said Hayes was involved in a tense conversation with an older man at the bar, or that Hayes pushed the man and the man punched Hayes in the face. She admitted to signing a handwritten statement, but said she did so because she was tired and wanted to leave.

¶ 22        Teasley stated that she never told police that John Morrissette had punched Hayes in the face because "They didn't ask." Although she acknowledged that the police treated her well, she stated that she was at the police station and had not slept from midnight to 10 a.m. She had coffee, but she did not eat anything.

¶ 23        Hayes testified in his defense. He stated that he and Teasley lived with their children at 2922 West Fillmore in Chicago. On November 24, 2007, he and Teasley went to the club to celebrate with Thumb and some friends. When Hayes got to the club around 1 a.m., Teasley was already there. He had two beers, and around 2:30 or 3 a.m., he and Teasley got into an argument because he wanted to leave. While arguing with Teasley, however, someone came over and asked him to leave. Hayes denied threatening that person. Hayes stated that he did not talk to any older men, nor did any older man punch him. He also stated that he had never seen McNeely before that night. As he and Teasley were arguing, Morrissette came over and punched Hayes in the face. Hayes fell to the floor and asked, "Why the fuck did you hit me?" Morrissette told him to leave and he got into his car and drove around. Hayes was angry and drove to cool off.

¶ 24        He went back to the club to check on Teasley, knocking on the interior door, which was locked. He saw people inside, but he could not tell whether Teasley was still there. Hayes denied that the bouncer made a motion across his throat indicating that the club was closed. He knocked a couple more times and a young lady opened the door. Hayes denied kicking in the door. When he walked in, people ran toward Morrissette. Morrissette had a shotgun, which he held in the direction of Hayes. Morrissette fired the gun and Hayes saw a flare of light and heard a bang. Hayes then took his gun from the back of his pants and fired toward Morrissette's feet to protect himself. He stated that he had the gun with him the entire night. Hayes then fired two more shots at the floor so he could escape.

¶ 25        Hayes testified that he threw the gun out of his car at Pulaski and Harrison. He went to Teasley's mother's house, where he asked Teasley to come down. At that point, 10 to 12 police cars arrived and Hayes started running because he was scared. He was soon caught and taken to the station. Hayes denied telling police that he had retrieved the .38-caliber weapon from the railroad tracks by his house before going back to the club. He also denied stating that he kept the gun there because he did not want his children playing with the gun at home. He stated that he did not tell police the bouncer at the club had a handgun that he fired into the floor.

¶ 26        In rebuttal, the State called Assistant State's Attorney (ASA) Emily Stevens, who spoke

with Teasley on November 24, 2007. Teasley told her that the police never threatened her, and they treated her well. Teasley gave a statement in which she said Hayes and an older man had a tense conversation at the club. Hayes pushed the older man and the man punched Hayes in the jaw. Teasley stated that she did not see anyone in the club with a weapon at the time. Hayes was really angry when he got into the car. Teasley never told ASA Stevens that a bouncer hit Hayes or that John Morrissette hit him.

¶ 27 Detective Bor in rebuttal stated that he spoke to Hayes in an interview room. Detective Jacobson, who was also in the room, advised Hayes of his *Miranda* rights and Hayes stated that he understood. Hayes stated that he went to the club for a party around 12:30 p.m. He met up with Teasley and some friends. He and Teasley got into an argument about her staying out too late and a bouncer came over. Hayes told the bouncer that he was going to "beat [his] ass" and the bouncer hit Hayes in the face. Hayes went outside and tried to get a tire iron out of his trunk, but he instead got into his car and left. Hayes went to his house on Fillmore and retrieved a .38-caliber handgun from the railroad tracks by his house. He kept the gun there because he did not want his small children to get to it. When he returned to the club, he knocked on the door but it was locked. He kicked open the door and he saw that the bouncer had a handgun. The bouncer fired one time into the floor. Defendant told Bor that he threw his gun out the car window at Pulaski and Harrison, but police never recovered the weapon.

¶ 28 The jury found Hayes guilty of aggravated battery with a firearm of John Morrissette, but not guilty of aggravated battery of a firearm of John Wilson, not guilty of the attempted murder of Morrissette, and not guilty of the attempted murder of Wilson. The trial court sentenced Hayes to 10 years' imprisonment. Hayes filed this timely appeal.

¶ 29                                        ANALYSIS

¶ 30 Hayes first contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm of John Morrissette. He argues that the witnesses who identified him as the aggressor provided contradictory, improbable testimony and had a motive to lie, whereas he consistently testified that he acted in self-defense and his testimony was corroborated by the physical evidence. When faced with a challenge to the sufficiency of the evidence, this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) (Emphasis omitted.) *People v. Young*, 128 Ill. 2d 1, 49 (1989). If a defendant raises the affirmative defense of self-defense, the State must also prove beyond a reasonable doubt that he did not act in self-defense. The elements of self-defense are: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) danger of harm was imminent; (4) use of force was necessary; (5) the threatened person actually believed a danger existed requiring the use of force; and (6) the threatened person's beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). The State satisfies its burden if it negates any one of these elements. *Jeffries*, 164 Ill. 2d at 127-28.

¶ 31 Furthermore, it is the jury's function to assess the credibility of the witnesses and the

weight to be given their testimony by resolving any conflicts or inconsistencies in the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Whether a defendant acted in self-defense is also a question for the jury to determine. *People v. Goliday*, 222 Ill. App. 3d 815, 821-22 (1991). A reviewing court will not reweigh the evidence or substitute its judgment on these matters for that of the jury. *Tenney*, 205 Ill. 2d at 428. On appeal, a conviction will be affirmed "unless the proof is so improbable, unsatisfactory, or unconvincing as to raise a reasonable doubt of defendant's guilt." *People v. Gill*, 264 Ill. App. 3d 451, 459 (1992).

¶ 32     Bertha and Morrissette testified that they observed some women trying to get Hayes out of the club and that he was wrestling and cursing because he did not want to leave. Morrissette stated that Hayes was very angry, and Hayes himself testified that he was angry. In an interview with police shortly after the incident, Hayes stated that after leaving the club, he went to his car to get a tire iron but then he just got into the car and drove away. McNeely's testimony corroborated this statement. Hayes also stated that he retrieved a .38-caliber weapon hidden by some railroad tracks, although he denied making the statement at trial.

¶ 33     Bertha testified that Hayes returned to the club, kicked open the locked interior door, and fired the first shot. Her testimony was corroborated by John Wilson and Morrissette. John Wilson also testified that when Hayes came in with the gun, he did not observe anyone else in the club with a weapon. However, he did see Morrissette holding a shotgun after the shooting was over. Morrissette testified that he grabbed his shotgun from the DJ booth after seeing Hayes with a gun. Both Wilson and John Morrissette suffered gunshot wounds to the foot and the bullet taken out of Morrissette came from a .38-caliber weapon. A gunshot residue test conducted on Hayes showed that he had discharged a firearm, contacted a GSR-related item or had his right hand in the environment of a discharged firearm. Viewed in the light most favorable to the prosecution, the evidence supports a finding that Hayes committed aggravated battery of a firearm of John Morrissette beyond a reasonable doubt. Furthermore, it supports the finding beyond a reasonable doubt that Hayes cannot claim self-defense because he was the aggressor.

¶ 34     Hayes argues that his conviction should be reversed because the testimony of the State's witnesses was implausible and unreliable, while his consistent testimony supporting self-defense provided a more probable account of the shooting. Hayes points to testimony that he claims contradicted the physical evidence in the case. Wilson testified that Hayes fired the first shot and hit him in the foot. The evidence showed, however, that Wilson had 22 or 23 holes in his foot. Hayes argues that the number of holes indicated Wilson was shot by a shotgun rather than a handgun, and since Morrissette had the shotgun, he must have fired the first shot. Also, the witnesses had different accounts of the manner in which Hayes fired the shots. Furthermore, Bertha, Wilson and Morrissette all testified that Hayes kicked open the locked interior door of the club. Hayes contends that this testimony is incredible because upon inspection the door sustained no visible damage.

¶ 35     The testimony, however, did not necessarily contradict the physical evidence in the case. As to the number of holes in Wilson's foot, the State theorized that one of the holes could have come from a shot fired from a handgun which is consistent with testimony that Hayes fired the first shot. Although their testimony about how Hayes fired the shots differed,

Bertha, Wilson, and Morrissette all testified that Hayes fired the first shot. Regarding the fact that the interior door showed no signs of damage, Bertha testified that only the lock of the door was affected such that the door no longer closed properly. It is the function of the jury to resolve any conflicts or inconsistencies in the evidence, and the jury reasonably chose to do so in favor of the State. See *Tenney*, 205 Ill. 2d at 428.

¶ 36    Hayes also questions the credibility of Bertha, Wilson, and Morrissette because all three initially lied to police about Morrissette's involvement in the shootings. Morrissette, a convicted felon, was not supposed to possess or handle a firearm. Hayes argues that their testimony identifying Hayes as the aggressor lacks credibility because they considered themselves family and since they had lied before to protect Morrissette, they would lie again. In contrast, Hayes never wavered from his initial statement that Morrissette fired the first shot.

¶ 37    Although Bertha always maintained that she did not see Morrissette with a gun on the night of the shooting, Morrissette and Wilson later acknowledged that he had a shotgun. Wilson admitted that he did not initially tell police he saw Morrissette with a gun because he was seeing Bertha at the time and wanted to protect Morrissette. However, at the time of trial Wilson was no longer dating Bertha. He decided he wanted to tell the truth and testified that he had seen Morrissette holding a shotgun that night, contradicting his statement to police after the shooting. His testimony, in turn, forced Morrissette to acknowledge that he did indeed possess and fire a shotgun. However, neither Wilson nor Morrissette wavered from his initial statement that Hayes fired the first shot. The jury must assess the credibility of witnesses and assign weight to their testimony. *People v. De Oca*, 238 Ill. App. 3d 362, 367 (1992). In making this determination, the jury here was aware of the inconsistencies and of the witnesses' possible motivations for testifying. Given the verdict, it clearly found Bertha, Wilson, and Morrissette to be more credible witnesses than Hayes. The jury is not required to believe Hayes' version of the events. *People v. Primbas*, 404 Ill. App. 3d 297, 302 (2010). We find that, viewed in the light most favorable to the prosecution, the evidence supporting Hayes' conviction was not so improbable, unsatisfactory, or unconvincing as to raise a reasonable doubt of his guilt.

¶ 38    Next, Hayes contends that his trial counsel provided ineffective assistance when he failed to introduce evidence of Morrissette's violent character, which would have been admissible pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). In order to prevail on an ineffective assistance of counsel claim, Hayes must show that (1) his counsel's performance was deficient so as to fall below an objective standard of reasonableness; and (2) the deficient performance prejudiced him so as to deny him a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88, (1984). Hayes is entitled to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). A reviewing court will not second-guess "the exercise of judgment, discretion, trial tactics or strategy even where appellate counsel or the reviewing court might have handled the matter differently." *People v. Schmidt*, 168 Ill. App. 3d 873, 882 (1988). To demonstrate sufficient prejudice, Hayes must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Since Hayes "must satisfy both prongs of this test, the failure to establish either prong is fatal to the [ineffective assistance of counsel]

claim." *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 39    At trial, Hayes' counsel attempted to question Wilson about an unrelated incident that took place after the shooting in which he had Morrissette arrested for putting a pistol in his face. The State objected, and counsel explained the evidence was relevant to show Wilson's bias and motive to lie. The trial court sustained the objection and counsel did not try to introduce the evidence again. Hayes now contends that the evidence was admissible and his trial counsel was ineffective for failing to introduce it pursuant to our supreme court's holding in *Lynch*.

¶ 40    *Lynch* held that when the defendant raises self-defense as a theory in the case, evidence showing the victim's aggressive and violent character is relevant to support the defendant's version of the facts when conflicting accounts of the occurrence exist. *Lynch*, 104 Ill. 2d at 200. Although convictions for violent crimes are reasonably reliable evidence of violent character, mere evidence of a victim's arrest is generally not sufficient "since it does not indicate whether the victim actually performed any of the acts charged." *People v. Ellis*, 187 Ill. App. 3d 295, 301 (1989); *Lynch*, 104 Ill. 2d at 201. However, a prior altercation or arrest without a conviction can sufficiently prove violent character if it is supported by firsthand testimony as to the victim's behavior. *People v. Cook*, 352 Ill. App. 3d 108, 128 (2004).

¶ 41    Here, the evidence of Morrissette's arrest may have been sufficient because Wilson was on the stand testifying firsthand as to the incident. However, counsel's theory of the case was that all of the State's witnesses had lied and therefore their testimony that Hayes was the aggressor in the shooting lacks reliability. If counsel wanted to admit this evidence to show Morrissette's violent character, he would have had the unenviable task of arguing to the jury on one hand that Wilson is a liar, but when it comes to the circumstances surrounding Morrissette's arrest, he is telling the truth. Instead, counsel decided to present the evidence under a rationale that was consistent with his theory of the case. This court will not second-guess counsel's exercise of judgment and trial strategy.

¶ 42    Furthermore, the jury had before it even more persuasive evidence of Morrissette's violent character. Morrissette himself testified that he had a 2006 conviction for burglary and a 2008 conviction for aggravated unlawful use of a weapon. See *Cook*, 352 Ill. App. 3d at 128 (a conviction, as opposed to an arrest, is "persuasive proof" that the victim committed the violent crime). He admitted that he kept a gun in the DJ booth and he did not hesitate to shoot at Hayes even though he was not supposed to handle or possess a weapon. The evidence of Morrissette's arrest to show his violent character is merely cumulative of that already presented to the jury, and thus, Hayes was not prejudiced by the failure of counsel to present Wilson's testimony. *People v. Whiting*, 365 Ill. App. 3d 402, 415 (2006) (Gilleran Johnson, J., dissenting). Since Hayes cannot satisfy the prejudice prong of *Strickland*, his ineffective assistance claim cannot stand.

¶ 43    Hayes' final contention is that the prosecutor's improper remarks in closing argument deprived him of a fair trial. Specifically, the prosecutor told the jury during rebuttal closing argument that it would receive a copy of Teasley's prior inconsistent statement, although that decision is normally left to the trial court's discretion. Initially, we note that Hayes has waived review of this issue since he did not object to the comments at trial. Failure to both

-10-

object at trial and raise the issue in a posttrial motion forfeits consideration of the issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Hayes argues that he did object to Teasley's redacted statement going back to the jury during a conference after closing arguments. However, even if Hayes' argument is taken on its merits, we find no error here.

¶ 44     A prosecutor has great latitude in making closing arguments. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). A prosecutor may comment on the evidence at trial, as well as reasonable inferences taken therefrom. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). He or she may even state an opinion that a defendant or defense witness is lying if it is based on the evidence or reasonable inferences drawn from the evidence. *People v. Jackson*, 140 Ill. App. 3d 318, 324 (1986). In assessing a challenge to closing remarks, we must consider the questionable comments in the context of the entire closing argument. *People v. Tipton*, 207 Ill. App. 3d 688, 701 (1990). We will not reverse a conviction based on improper prosecutor comments unless the statements were a material factor in the conviction or caused substantial prejudice to the defendant. *Tipton*, 207 Ill. App. 3d at 699-700.

¶ 45     In rebuttal closing argument, the prosecutor stated:

"But what that means is that you are able to take this statement back with you into the jury room and take what is written in here as what we call substantive evidence. And what that means is it is as if Erica Teasley told you what is in this statement while she testified. She didn't. She got up there and lied. But the law allows you to take what she said in here the early morning hours after the incident as if she said it under oath on that stand. This is the original. You are actually going to get what we call a redacted copy. What that means is some stuff has been crossed out. You are only getting the portions of the statement that she lied about on the witness stand. So don't worry about what has been crossed out. Erica Teasley had what we refer to as selective memory. She was only able to remember the parts that helps her boyfriend, but she conveniently forgot everything that was damaging. And all those damaging factors are in that handwritten statement, and we encourage you to read it when you get back there."

Hayes contends that the remarks improperly misstated the law and unduly emphasized Teasley's statement over the other evidence in the case.

¶ 46     The prosecutor did not misstate the law. Teasley's statement was properly admitted into evidence. Her fault, if any, was stating the presumption that the jury would receive the statement when in fact it is a determination within the trial court's discretion to make. See *People v. Caldwell*, 39 Ill. 2d 346, 359 (1968). Outside the jury's presence the trial court admonished the prosecutor for saying that jurors would get to see the statement before they had asked for it and before the trial court could make its determination. There was no question, however, that the jury could have received the redacted statement as substantive evidence. See *People v. Lee*, 243 Ill. App. 3d 1038, 1044 (1993). In fact, the trial court did subsequently allow the statement to go back to the jurors upon their request.

¶ 47     Furthermore, the prosecutor made arguments based on the evidence and in response to defense counsel's closing argument. As Hayes acknowledges, witness credibility was a key issue for both the State and the defense. In his closing statement, defense counsel argued at length about how each of the State's main witnesses lied. Counsel also acknowledged that

Teasley's statement that an older man fought with Hayes contradicted her trial testimony that Morrissette punched Hayes. Counsel then stated, "But remember she told the State's Attorney at the police station that morning it was some older man. Couldn't that be John Morrissette? Was that really such a lie?" The prosecutor, in rebuttal, made the comments Hayes now challenges on appeal. Prosecutor remarks are proper if made in response to defense counsel's argument. *People v. Kliner*, 185 Ill. 2d 81, 154 (1998).

¶ 48     Hayes also contends that the remarks improperly emphasized Teasley's statement and testimony over other evidence, distracting the jury from the facts of the case. Therefore, the jury should not have received the statement. He cites *People v. Panzer*, 73 Ill. App. 3d 1 (1979), as support. In *Panzer*, the trial court refused to allow the defendant's statement to go to the jury because it believed doing so would place "undue emphasis on one piece of evidence" and this court found no abuse of discretion. *Panzer*, 73 Ill. App. 3d at 8-9. *Panzer*, however, merely reiterated the general law that the trial court has the discretion to determine whether a statement should go to the jury, and its determination will not be overturned on appeal absent an abuse of that discretion. *Panzer*, 73 Ill. App. 3d at 8.

¶ 49     Unlike the trial court in *Panzer*, the trial court here allowed Teasley's redacted statement to go to the jury. The statement was admitted as substantive evidence, and in light of the contradictions between Teasley's statement and trial testimony, "it is understandable that a jury would find it valuable to review the same." *Lee*, 243 Ill. App. 3d at 1044. The trial court did not abuse its discretion. Furthermore, Hayes' argument that the jury overemphasized the significance of Teasley's statement is without merit. The jury is instructed to weigh all of the evidence in the case, and there is no indication that it did not consider or weigh the other evidence.

¶ 50     For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 51     Affirmed.